264 So.2d 263 (1972)
Mrs. Nellie QUIROZ, wife of and Farley E. RHODES
v.
MAX FACTOR, INC., and Phoenix Assurance Company of New York.
No. 4806.
Court of Appeal of Louisiana, Fourth Circuit.
June 20, 1972.
Rehearing Denied July 18, 1972.
Thomas L. Giraud, New Orleans, for plaintiffs-appellants.
Montgomery, Barnett, Brown & Read, Daniel Lund, New Orleans, for defendantsappellees.
*264 Before CHASEZ, STOULIG, and BOUTALL, JJ.
STOULIG, Judge.
This is a suit by Mrs. Nellie Quiroz, wife of and Farley E. Rhodes, to recover damages for injuries to her hair and scalp allegedly caused by the use of Max Factor Straight Set, a hair straightener product. The undisputed facts are that Mrs. Rhodes purchased the hair kit, applied the ingredients to a portion of her hair (a strand test) on the same day, and then performed an entire head application the following evening. Upon this second application Mrs. Rhodes experienced a burning and itching sensation which caused her to accelerate the procedure by removing the relaxing ingredient in less than the directed time. Appellant's physician found approximately three days later that she had redness through out the scalp and some scattered areas of skin breakdown with seepage of fluids. Appellant also alleged some damage to and loss of hair which, though unconfirmed by her doctor, was supported by the testimony of an acquaintance. Specifically pleading the doctrine of res ipsa loquitur, appellants alleged negligence by Max Factor, Inc., in that the product was unfit for its intended purpose. Appellees entered a general denial and a supplemental answer additionally pleading contributory negligence consisting of the plaintiff's failure to reasonably and prudently apply the product and to follow the printed instructions for its use.
The court found for the defendant based upon the testimony given and exhibits consisting of the product box containing a warning statement,[1] its contents with an extensive instruction sheet reiterating the warning[2] and emphasizing the required strand test.[3] In his reasons for judgment the trial judge made the following observations and findings which we have summarized in part and quoted in part:
1. Through its production and marketing practices, pre-marketing tests, continuing tests, including salon tests on live models, extensive quality control in manufacture, packaging and marketing,[4] Max Factor, Inc., exercised the "* * * ordinary and prudent degree of conduct to insure safe usage and to discharge the legal responsibility of the duty owing to its consumer * * *."
2. "Furthermore, there are elaborate instructions which are printed on a brochure pamphlet contained within *265 the packaged content of the box and also admonitions, warnings and other instructions contained on the exterior of the box. These items delineated the conduct of the manufacturer to the point * * * that they have conducted themselves prudently."
3. The doctrine of res ipsa loquitur did not apply because the product "does not remain within the exclusive control of the manufacturer, but in fact it come within * * * the degree of skill and application in following the instructions reposed in the consumer * * *
4. "But if the doctrine did apply, they [Max Factor, Inc.] have discharged their duty of responsibility to the average consumer."
5. If a specific reason for plaintiff's injury were found other than allergic reaction, it would have to be her misuse of the product in that she did not follow strand test instructions which would have "forewarned she would have been allergic to it and perhaps spared herself of the ill effects."
6. In any event, plaintiff's injury was due to no fault of the manufacturer but rather to plaintiff's allergic nature or her misuse of the product.
7. Plaintiff's doctor "specifically said that he is not able to tell whether she had * * * [a] burn or an allergic reaction.
Under these circumstances, he is expressing doubt of a material element that the plaintiff is obligated to prove, namely * * * that there is a reasonable medical probability that this ill effect was the result of a burn, and secondly, that the burn was a result of some negligence on the part of the manufacturer. In both these particulars, the Court feels that the plaintiff has not sustained its burden of proof * * *."
Apparently abandoning all other issues on appeal, appellants allege the assignment of error that the trial court erroneously relied upon the case of Thomas v. Gillette Company, 230 So.2d 870 (La.App.3d Cir. 1970), in that the facts of this case differ from the Gillette case in two respects. Quoting from appellants' brief these differences are: first, "Mrs. Thomas' doctor testified that she suffered an `acute allergic reaction' to the hair relaxer product"; and, secondly, "the evidence [in Gillette] failed to show any vice or defect in the `Curl Free' which was used by plaintiff in that none of the ingredients used in making the relaxer lotion is a primary irritant." We find these distinctions to be without significance.
On almost perfectly corresponding facts as this case, the court found in Gillette that the plaintiff had failed to carry the burden of proof of negligence and that the doctrine of res ipsa loquitur did not apply. The court in Gillette quoted the Supreme Court in Morales v. Employers' Liability Assur. Corporation, 202 La. 755, 12 So.2d 804 (1943), as follows:
"`It is the duty of the plaintiff to prove negligence affirmatively; and, while the inference allowed by the rule of res ipsa loquitur constitutes such proof, it is only where the circumstances leave no room for a different presumption that the rule applies. When it is shown that the accident might have happened as the result of one of two causes, the reason for the rule fails and it can not be invoked.'" 230 So.2d at 875, 876.
See also Hanchey v. Central Louisiana Electric Company, 218 So.2d 399 (La.App. 3d Cir. 1969).
In applying this rule to the Gillette facts, the court there observed at page 876 of 230 So.2d:
"In the instant suit there are several reasonable conclusions which could be *266 drawn as to the cause of plaintiff's scalp irritation and hair loss, other than that defendant was at fault * * *. One reasonable explanation is that Mrs. Thomas was unusually sensitive or allergic to that lotion * * * and that this rare idiosyncratic sensitivity, rather than a vice or defect in the product, was the sole cause of her scalp and hair injury. * * *
* * * It was also established by the defendant that Mrs. Thomas did not perform the strand test according to the instructions contained in the `Curl Free' kit, and it might reasonably be concluded that if she had done so, she would have been forewarned of the allergic reaction which she experienced. Since it can reasonably be concluded that plaintiff's scalp and hair injury could have been caused by circumstances not involving a defect in the hair relaxer lotion or fault on the part of defendant, there can be no inference of negligence on the part of the defendant manufacturer, and thus the doctrine of res ipsa loquitur is not applicable. [Citations omitted.]"
In the instant case, appellants' contention that plaintiff's mere nonallegation of allergic reaction operates to shift the burden of proof to the defendants is without basis in law or jurisprudence. Plaintiff did not allege allergic reaction because it is clearly not compensable in this type of case. Instead she pleaded general negligence and res ipsa loquitur. As indicated above, to avoid this doctrine of evidence the defendants needed only to prove an equal probability that the injury may have resulted from causes other than defendant's negligence. This the defendants did. Thus res ipsa loquitur did not apply and the burden of affirmative proof of negligence remained the responsibility of the plaintiffs. This burden they failed to discharge.
Further, the record does not support appellants' contention that expert medical testimony proved an acid caused the injuries to Mrs. Rhodes' scalp. Defendant's product developer, an expert chemist, emphasized that the active ingredient of the product was not thioglycollic acid but a derivative thereof. Plaintiff's own physician testified repeatedly that he "was not able to differentiate from an allergic reaction as compared to a caustic reaction." After having stated he had no reason to doubt Mrs. Rhodes' statement to him that her injuries were caused by an acid, the court queried:
"But you are not in a position to tell us, with a reasonable medical certainty, that you can conclude that this condition, from which you say may have resulted from the use of this product, was actually a burn or an allergic reaction?"
to which the witness responded:
"Yes, sir. That's correct. I'm not able to make that determination."
This admission substantiates the trial court's conclusion that plaintiff failed to bear the burden of proof in establishing that the injury was a caustic burn.
The record does not substantiate appellants' contention that ammonium thioglycollate is a "primary irritant," a characterization first raised by counsel on appeal. In alleging the product contains a primary irritant, appellant implies that the manufacturer is thereby liable. The only evidence possibly relating to this matter is the testimony of defendant's chemist, who stated that a concentration of 60-percent active ammonium thioglycollate will cause cutaneous inflammatory response to the skin of the average individual, thus apparently constituting a primary irritant under the definition given by a witness in the Gillette case.[5] However, he further testified *267 that home permanents "usually run seven and a half to eight percent," and that the actual percentage of ammonium thioglycollate in the Max Factor relaxer cream is "much lower than eight percent." The chemist emphasized it is "much, much lower."[6] Extensive tests for skin sensitization with the marketed product indicated no positive responses. Concluding then that the relaxer cream with this small amount of active ingredient is not a primary irritant, no useful purpose would be served by discussion of the obligation of the manufacturer to the consumer for use of a product containing a primary irritant. Suffice it to say that the manufactuer in this instance exceeded the standards enunciated in the jurisprudence for products containing ingredients the use of which may be remotely hazardous.[7]
For the foregoing reasons, the judgment of the lower court is affirmed, all costs of this appeal to be borne by appellants.
Affirmed.
NOTES
[1] Appears on both sides of the box as follows:

"CAUTION:
This product is safe for normal skin and hair. If any allergic reaction develops while using, discontinue use. Hair and scalp must be in good condition prior to use. If any abnormal condition exists, including abrasions, bruises or irritation of scalp, do not use this product until abnormal condition has been corrected. Follow directions carefully."
[2] "CAUTION:

1. Your scalp must be in good, healthy condition. If it is bruised, irritated, sore, scratched or sensitive, do not use Straight Set until your scalp and skin are in healthy condition.
* * * * *
3. Always make a Strand Test before you apply Straight Set. * * *"
[3] "BE SURE YOU CAREFULLY READ AND UNDERSTAND ALL DIRECTIONS BEFORE YOU BEGIN.

* * * * *
THE STRAND TEST
It is important that you take this Strand Test before each application of Straight Set.
3. * * * After the sample strand dries, if your hair is brittle, shows breakage or is unsatisfactory, you should not use Straight Set at this time.
Give yourself a complete application only if you are satisfied with the Strand Test results. * * *"
[4] Max Factor has conducted 750 field tests, 97 prior to the marketing of the product, without adverse results. Many of these tests were conducted with a higher percentage of active ingredients than the marketed item.
[5] According to the court in Gillette, cited supra, plaintiff's physician witness "defined a primary irritant as a chemical which, in given strengths, would cause a reaction in any person, but that the strengths necessary to cause such a reaction would vary from one individual to another."
[6] The chemist withheld with court approval the exact percentage, a valuable trade secret.
[7] The chemist testified that 1,224,924 kits have been sold as of December 1970, and that only 65 complaints have been received. Of these most complainants admitted misuse of the product or failure to follow directions.