UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-40691
_____


OLAN J. GUILBEAU, SR., Et Al.,

Plaintiffs-Intervenors-Appellees,
Cross-Appellants,

versus


W. W. HENRY CO., Et Al.,

Defendants-Appellants,
Cross-Appellees.

ELWOOD STEVENS, Et Al.,

Intervenors-Appellants,
Cross-Appellees.

_____

Appeals from the United States District Court
for the Western District of Louisiana
_____

June 11, 1996

Before REYNALDO G. GARZA, BARKSDALE, and EMILIO M. GARZA, Circuit
Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The linchpin of this appeal is whether plaintiffs presented
evidence of product defect sufficient to withstand judgment as a
matter of law. W. W. Henry Company and its insurer, Truck
Insurance Exchange, challenge a judgment on a jury verdict awarding
$2 million to Olan Guilbeau for chronic toxic encephalopathy
allegedly caused by exposure to a carpet adhesive manufactured by
Henry, and $900,000 (remitted to $50,000) to his wife, for loss of

consortium, contending that there is insufficient evidence of product defect and causation, and, in the alternative, that a new trial should have been granted because the Guilbeaus' attorneys deliberately appealed to jury prejudice by making inflammatory arguments and referring to inadmissible evidence. Guilbeau's wife cross-appeals the remittitur; the Guilbeaus cross-appeal the award of prejudgment interest, and challenge the exclusion of certain evidence. Intervenors Elwood Stevens and his law firm, previous counsel for the Guilbeaus, appeal from the district court's refusal to award them any attorney's fees; the Guilbeaus cross-appeal the allowance of intervention and the award of expenses to that firm. Because no rational juror could find that Henry's product was defective, the judgments in favor of the Guilbeaus and the intervenors are **REVERSED** and judgment is **RENDERED** for Henry.

## I.

From the 1970s until August 1986, Guilbeau worked as a mobile home salesman for various entities in and around New Iberia, Louisiana. At the end of 1982, after his mobile home business failed and he took personal bankruptcy, he returned to work for Mobile Home Brokers (Luv Mobile Homes) in New Iberia. In 1985, he began complaining about an unpleasant odor in the mobile home office in which he worked.[1] Mrs. Guilbeau testified that the

---

One of Guilbeau's diaries states:

> At the beginning of my employment at the New Iberia Sales Lot I brought to the manager's attention that there was a smell in the ... [o]ffice.

mobile home was parked in a low area, and that the smell from underneath it would seep into Guilbeau's office from an improperly sealed air conditioning duct; she stated that it was a rotten smell, but never made him sick.[2]   The mobile home had been

> ....
>
> > I have been complaining ... for over a year, but ... did not know what this odor was or where it was coming from.  In accordance to [*sic*] the information I have received lately that when particle board gets wet it releases ... chemicals which is called off-gasing ... when its [*sic*] hot and humid ... [and this] off-gasing [is] dangerous to human health.

There was evidence that new mobile homes have strong smells, from formaldehyde, that irritate the eyes and nose.

Two diaries, and a copy of another diary containing Mrs. Guilbeau's handwritten additions, were admitted into evidence. Although one of the diaries contains a cover page which includes the statement, "I want all hereinwritten presented as evidence", Mrs. Guilbeau testified that the diary was prepared in 1987 or 1988, for the purpose of trying to get medical help for Guilbeau, and not for the purpose of litigation.  And, Mrs. Guilbeau testified that unusual phrasing (for example, "Due to the extreme buckling of said mobile home particle board flooring in said lobby and restroom area in said Mobile Home Office, ...") was just the way her husband talks.

In a January 1993 minute entry, the district court stated that, upon advice of all counsel, Guilbeau was unfit as a party plaintiff; counsel were given 60 days to substitute a curator, or to show cause why Guilbeau had the procedural capacity to stand trial.  An amended minute entry conditioned the continuance on Guilbeau's examination by a psychiatrist to determine whether he had the physical and mental capacity to act as party plaintiff.

That August, Henry moved to dismiss, asserting that Guilbeau lacked the capacity to proceed.  The court denied the motion on December 22.

On January 24, 1994 (the day the case was set for trial), Henry moved to compel Guilbeau's testimony or, in the alternative, for a competency hearing on whether he could testify.  At a hearing that same day, Henry's expert witness, Dr. Berger, who had examined Guilbeau over the preceding weekend, testified that, if present and

manufactured in 1978; the floor was rotten and buckling, and the carpet was old and worn out.

In August 1986, arrangements were made to repair the floor and replace the carpet in the mobile home office. The new carpet was installed in the living-dining area, which served as a waiting room for customers, part of the hallway, and in the bathroom, but not in Guilbeau's office.

On Thursday, August 14, two of Guilbeau's co-workers, Jonathan Shaw and Rawlin Duplechin, removed the old carpet and particle board subflooring, which had to be cut with a saw, and replaced the subflooring with plywood. Duplechin testified that sawdust, mildew, and mold were generated from the tearing-out operation, but both he and Shaw testified that Guilbeau did not complain during that phase of the repairs. Duplechin testified that Guilbeau stayed in his office, which was in a separate room, most of that day, but would go outside occasionally because "it was getting too strong, he had to get a little bit of air".[3] Guilbeau's diary reports that "[t]he smoke, sawdust and a strong smell ... got so

_____

a witness at trial, Guilbeau probably would disrupt the trial because he has the emotional level of an eight-year-old, is unruly, and throws violent, explosive tantrums as soon as he is stressed. The court apparently rejected Dr. Berger's suggestion that a trained policeman be appointed to assist the court in keeping Guilbeau under control, and that a psychiatrist subject him to a major tranquilizer to prevent him from tearing the courtroom apart, because Guilbeau did not testify at trial. Mrs. Guilbeau testified that he was not capable of it physically or emotionally, because of the odors in the courtroom, and because the questions would cause him to become agitated and confused.

Shaw testified similarly that Guilbeau was in and out of the office while the repairs were being made.

- 4 -

bad that it was hard for me to breath[e] and it would burn my eyes and nose". Mrs. Guilbeau testified that he said the smell from the repairs that day was strong, and burned his eyes and nose, but that he was not sick. Guilbeau left the office early that afternoon, about 4:00 or 4:30 p.m.

On August 15, Guilbeau arrived at the office around 8:00 or 8:30 a.m. His diary reports that he immediately noticed a strong, irritating smell, had difficulty breathing, and that his eyes, nose, throat, and lungs were badly irritated. Later that same day, Shaw purchased a three-and-one-half-gallon can of Henry #270 carpet adhesive from a local supplier.[4] Shaw and Duplechin began installing the new carpet that same day, around 9:30 or 10:00 a.m.[5] Shaw spread the adhesive on the floor with a trowel, and Duplechin rolled out the new carpet. They did not wear masks or use air bottles. It took them an hour and a half to two and one-half hours to install the new carpet.

Duplechin testified that while the adhesive was being used and afterward, the windows and doors were open to ventilate the mobile

_____

The sales receipt reflects that one three-and-one-half-gallon can of Henry #170 adhesive was purchased; but Shaw testified that he bought #270, and that the receipt was in error. Henry introduced another receipt from the same supplier, indicating that #270 adhesive was purchased on February 10, 1987, but Shaw testified that there was no confusion about which adhesive was used to make the August 1986 repairs. Shaw testified that he read the label, which contained no warning about dangers to human health, and that, if the label had contained such a warning, he would have passed it on to Guilbeau.

Duplechin could not remember whether the carpet was installed in the morning or afternoon; Mrs. Guilbeau testified that it was not installed until after lunch.

home, and that there was cross-ventilation throughout the repair operation. Shaw testified, however, that the doors were closed while the carpet was being installed, and that the windows and doors were opened after the installation was completed. Duplechin testified that Guilbeau was in the office while the carpet was being installed, but went in and out to show other homes to customers.

Shaw testified that an air conditioning vent was under Guilbeau's desk, and that the air conditioning system in the mobile home recycled the air inside the mobile home. He testified that a substantial amount of recycled air with the odor of adhesive was coming from the vent under Guilbeau's desk and that, at Guilbeau's request, he blocked the outlet in Guilbeau's office after the repairs were completed at the end of the day that Friday.[6]

Shaw and Duplechin testified that the smell of the adhesive was "strong", but that it did not make them sick. Duplechin testified that Guilbeau thought the adhesive had a strong smell, and complained that it made him sick and dizzy; but he did not observe Guilbeau with watery eyes or having trouble breathing. Shaw testified that Guilbeau started complaining when they began installing the carpet, and put toilet tissue in his nostrils because of the smell; and that Guilbeau went in and out of the office frequently to get fresh air because the fumes made it difficult for him to stay in the office.

---

Guilbeau's diary states, however, that duct tape was applied to seal the floor air supply duct during the late morning on August 15.

Guilbeau left the office between 3:30 and 4:30 p.m. on Friday, to keep an appointment with some customers at the Lafayette sales lot.[7] Mrs. Guilbeau testified that when he got home, he was depressed, quiet, and irritable, but said that he was all right when she asked him if something was wrong, and did not mention odors.

Guilbeau returned to the office around 8:00 or 8:30 a.m. the next day, Saturday, August 16. Mrs. Guilbeau testified that he told her he could smell the odors from the mobile home from his truck, 25 feet away. His diary states that the smell was one he had never smelled before, and that it was "cool and burning"; that he opened the windows and went outside; and that he could still smell a "slight odor" when he went back inside, but it was only the smell of new carpet.

Guilbeau was at the office that Saturday until approximately 1:30 p.m., but had to leave because he was sick.[8] His diary reports that he experienced numerous symptoms, including sweating, numbness of his chin and mouth, burning eyes, ears, throat, and lungs, headache, nausea, and confusion.[9] His diary reports that

Guilbeau's diary states that Travis Knight noticed from his facial expression that he was very depressed, but that he had not noticed any depression until Knight mentioned it.

Although Guilbeau's diaries state that he left the office at 1:30 p.m., Mrs. Guilbeau testified that he stayed in the office until 3:30 or 4:00 that day.

Guilbeau's diary reports that, after sitting at his desk for some time, the next thing he became aware of was that it was 11:30 a.m., and he was in his truck, driving; he purchased food and drink and returned to the mobile home office at 11:35 a.m.

- 7 -

while driving away from the sales lot on his way to Lafayette, the back of his head felt like someone was pushing on it, he felt paralyzed and it was hard for him to drive, it felt like someone was squeezing his brain with their hands, his mouth was dry, and he was light-headed and weak. He called Mrs. Guilbeau from Lafayette, told her he was sick, and asked her to meet him at home. His diary states that he experienced the same symptoms again while driving home. When they arrived at home, Guilbeau told his wife that he felt like something was squeezing his brain and that there was "stuff" that was all over him.

Mrs. Guilbeau testified that Guilbeau felt a little better when he woke up on Sunday, but continued to complain of a headache, weakness, dizziness, light-headedness, and aching all over, as if he had the flu. He did not go to the office on Sunday.

The following Monday, August 18, he went to the office, but stayed only three and one-half hours, because he was ill.[10] Guilbeau's diary reports that he arrived at the office at 8:30 a.m., left at 11:00 a.m., returned at 12:30 p.m., left again at 1:30 p.m. to go to the doctor, and did not return to the office that day. Mrs. Guilbeau testified that he called and told her that he had experienced the same symptoms of light-headedness, headache, and confusion, and that he had gone to the doctor. Shaw testified that the odor was still strong on Monday, and that Guilbeau was

_____

His diary reports that the only odor he smelled was from the new carpet.

- 8 -

still complaining and still had tissue in his nose.[11]

Joseph Thibodeaux, the salesman who replaced Guilbeau, testified that the odor from the adhesive "was tough ... rough ... pretty bad", that it remained for a month or two, and that customers complained about the smell, and had to leave the office because their eyes were burning.[12] Thibodeaux testified that he tried to use Guilbeau's office for a few days, but could not because of the smell, so he moved to a different office; that the smell made him sick, dizzy, and caused his eyes and nose to burn; that he took off one afternoon, but did not go to the doctor; and that he has been fine ever since, even though he continued to work in the mobile home for two to three months.[13] Thibodeaux testified that he had seen Guilbeau two nights prior to his testimony, and that Guilbeau had lost weight and looked sick.[14]

On Monday, August 18, Guilbeau visited Dr. Clause, who had been treating him since 1964. Guilbeau reported exposure to glue two days earlier, and complained of headaches, light-headedness, tingling sensations of the skin, and numbness in his chin. Dr. Clause observed wheezing in his lungs and a red throat. Urine and blood tests were normal except for elevated cholesterol and

---

According to Shaw, the odor continued "for a long time".

Thibodeaux testified that the smell was from the adhesive, but that it was exactly the same smell he had encountered in new mobile homes, except that it was much stronger.

Shaw testified, however, that Thibodeaux did not get sick.

Thibodeaux testified that Guilbeau came to his house because Thibodeaux's telephone was out of order and Guilbeau's lawyers wanted to reach him.

triglycerides.  Dr. Clause testified that he observed no distress, confusion, speech or learning impairments, or differences in Guilbeau's behavior, that Guilbeau showed no signs of convulsions, weakness, tremors, paralysis, twitching, unsteadiness, reflex abnormalities, activity changes, or lack of coordination, and that Guilbeau did not complain of sleep disturbance, narcosis, excitability, depression, irritability, restlessness, nervousness, delirium, hallucinations, equilibrium changes, loss of appetite, stupor, fatigue, nerve damage, or visual disorders.

Guilbeau did not go to the office on Tuesday, August 19, but went back to work on Wednesday, the 20th.[15]  Mrs. Guilbeau testified that he did not stay at the office all day, but went to the hospital; he did not call her because he could not remember her telephone number.  Guilbeau's diary states that he was at the office from 8:30 a.m. until 4:30 p.m.  At the hospital that day, Guilbeau was examined by Dr. Sabatier, who found decreased oxygen in Guilbeau's blood, which he attributed to smoking; but chest x-rays showed no evidence of organic solvents, and no traces of such materials were found in his blood or urine.  Mrs. Guilbeau testified that the doctors ran tests and said Guilbeau was fine, but that he should stay away from the office for a couple of days.  She said that on Thursday and Friday, he complained about pressure in his head, pain in a certain spot in his back, numbness in his face, weakness, and bloating.

_____

His diary reports that the odor was strong when he arrived, but that after he opened the windows and doors, there was only a slight smell, which was not as strong as it had been in the past.

Guilbeau did not return to the office until Monday, August 25. Mrs. Guilbeau testified that he went home early because he could not take the smell, which was making him sick. Guilbeau's diary reports that he was at the office that day from 9:00 a.m. until 4:30 p.m., and that it was the last day he was able to go to work. Mrs. Guilbeau testified that he was complaining about his stomach, and she took him to see Dr. Fournet, who x-rayed his lungs and tested his blood and urine, but found no abnormalities.

Although Dr. Fournet prescribed Tagamet and gave Guilbeau a cortisone shot, Mrs. Guilbeau testified that his condition worsened. She stated that he would sit in his recliner like he was in a daze, and would shake; she described a "pain attack" during which Guilbeau got flushed, white around the mouth, and started shaking and sweating. After the attack, he could not move his arms and legs, and said it was like everything inside him had quit functioning.

Mrs. Guilbeau testified that Guilbeau was not sleeping well, and could not find his way out of bed to the bathroom, and that his condition continued to worsen gradually for the next two years. She testified that his symptoms include impotence, vision problems, pain in his ears, nose, throat, chest, and back, sleep disturbances, pressure in his head, penile lesions, sores in his groin area and on his buttocks, fizzy urine with red, white, and brown crystals and "mushroom" type things that looked like cotton

balls in it,[16] white particles in his stool, sores at his hair line, which has started to recede, seizures, and confusion.[17]

Dr. Fournet referred Guilbeau to Dr. Wong, a pulmonary specialist.  On September 4 and 5, Dr. Wong examined Guilbeau and found a 30% loss of lung use.[18]

On October 1, Guilbeau saw Dr. Ellithorpe at Tulane University; he reported that he was in his usual state of health until August 15 when carpet was installed in his office; and that he noticed some irritation from the carpet adhesive, which became more noticeable in the next several days.  He then saw an internist, Dr. Nix, who referred him to a psychologist, Dr. Friedberg, who testified for Henry at trial as an expert in clinical psychology.

Dr. Friedberg examined Guilbeau on October 21, 1986; Guilbeau was hospitalized at the time.  Dr. Friedberg was unable to get a complete history because Guilbeau was discharged from the hospital before he could complete the evaluation.  Dr. Friedberg

_____

Henry's expert witness, Dr. Berger, testified that the crystals in Guilbeau's urine were caused by high uric acid.

Mrs. Guilbeau testified that before the exposure, Guilbeau had a bump on his foot, caused when he fell from a horse, but that the bump went away after the exposure; and that Guilbeau gets lesions when he smells smoke from a fireplace or when he is exposed to chemicals, perfume, or shampoo.  His diary contains a drawing of his vein, and he reported that he could feel chemical deposits moving through his veins, creating "a cool, itching, raw, burning pain".

Guilbeau's diary states that Dr. Wong told him that if he wanted to get rid of his wife, that was the time to kill her, because there was not a court in the land that would convict him in the condition he was in.

administered the Minnesota Multiphasic Personality Inventory (MMPI) to Guilbeau; the results and Friedberg's analysis indicated that Guilbeau was a somaticizer, meaning that he complained of physical ailments without physical cause. The MMPI scales for hypochondriasis, hysterical components, conversion reactions, depression, and psychopathic deviant (which measures impulsivity and poor impulse control) were elevated. Friedberg thought Guilbeau's anxiety levels were very high, and that he needed some psychological or psychiatric treatment, but Guilbeau was very resistant.

Friedberg testified that he had treated other toxic exposure patients, and saw no parallels between those patients and Guilbeau; however, he could not rule out that Guilbeau might have suffered from organic brain damage with a psychological overlay. He expressed no opinion as to whether Guilbeau's psychological problems might be related to organic brain damage and exposure to organic solvents.

Dr. Rees, a psychiatrist who testified at trial as an expert witness for Henry, first examined Guilbeau on March 18, 1987, and saw him four more times. Guilbeau reported that he had been exposed to formaldehyde and carpet adhesive, and complained of feeling very ill and very weak. His symptoms included smelling ether in the bathroom, seeing things that were not there, extreme anxiety, anger, and complaints about at least eight parts of his body; Dr. Rees was concerned that Guilbeau might go into an uncontrollable rage.

Dr. Rees testified that Guilbeau appeared to be quite distressed and was very angry with every physician who had examined him. He diagnosed a somaticization disorder.[19] He did not think that exposure to toxins could have caused all the symptoms that Guilbeau was reporting, and could not have caused Guilbeau's unusual anger at every physician he had seen. He testified that he was absolutely certain that Guilbeau's symptoms had nothing to do with his exposure to adhesive, and that he was sure, as the result of his examination, that Guilbeau did not have organic brain damage.[20]

Dr. Black, a professor of psychiatry and neurology at Tulane Medical Center, examined Guilbeau in 1988 or 1989 and 1990. On both occasions, Dr. Black conducted extensive psychological testing, and found no brain damage, but found somaticizing and histrionic personality disorders. Dr. Black's 1989 report states that Guilbeau's complaints are more likely than not due to a psychiatric disorder rather than to residual effects of any alleged toxic exposure. His 1990 report states that Guilbeau meets the diagnostic criteria for organic delusional syndrome, and he testified in his deposition that "organic" does not mean an organic brain disease or any brain dysfunction. The report concludes that

---

Mrs. Guilbeau testified that Dr. Rees insulted Guilbeau, and that Guilbeau got upset with Dr. Rees.

Guilbeau was also seen by another psychiatrist, Dr. Covington, who found no brain dysfunction.

he does not feel that Guilbeau has brain damage based on available data, but that brain damage "cannot be absolutely ruled out at this time".

In March 1989, Guilbeau saw Dr. Callender, who had previously seen him in December 1986.[21] Dr. Callender, who is board certified in internal medicine, testified for the Guilbeaus at trial, as an expert in internal medicine, neurotoxicology, and occupational medicine.[22] Guilbeau reported to Dr. Callender that he had been exposed to glue and formaldehyde on August 15, 16, and 18, 1986, and for one to two weeks thereafter. His complaints included depression, numbness, difficulty walking, pressure in the back of his head, difficulty thinking, difficulty breathing, bloating, headaches, sweating, weakness, shaking, a bad taste in his mouth, chest pain, irritation of eyes and nose, disorientation,

---

Mrs. Guilbeau testified that, by that time, Guilbeau had begun to be sickened by odors; that he has temper tantrums and loses all control when he is exposed to chimney smoke; and that the odors of cleaning fluid, new clothing, perfume, hair spray, deodorant, and shampoo make him ill. A sign posted on the door of the Guilbeaus' home states: "DO NOT ENTER If you are wearing the following[:] perfume[,] hair spray[,] cologne[,] after shave[,] deodorants[,] new clothing[,], powder[,] makeup[.] There is a Toxic person living in this house who is allergic to all these above products. With your understanding, we can help him from having severe seizures and severe multiple pain".

Amazingly, the smoke from the one and one-half to two packs of cigarettes he smokes each day has no adverse effect on Guilbeau; and he is not bothered if others smoke cigarettes in his presence. He uses a lighter with lighter fluid to light his cigarettes, but has not complained about the smell from the lighter fluid.

Mrs. Guilbeau was employed by Dr. Callender at the time of the trial; she began working for him after he began treating Guilbeau. He testified, however, that her employment had not compromised his medical objectivity.

irritability, personality change, tingling sensations, fever, tachycardia, shortness of breath, memory loss, ringing ears, blurred or double vision, balance problems, sexual dysfunction, and confusion. Except for depression, a raw throat, a little congestion in the lungs with some wheezing, and a slightly tender abdomen, Dr. Callender's physical examination of Guilbeau revealed no abnormalities. Blood and urine tests were performed, as well as an electroencephalogram (EEG) and magnetic resonance imaging (MRI), and all of the results were normal.

A SPECT scan of Guilbeau's brain was administered by Dr. Subramanian on March 26, 1990.[23] The scan showed decreased blood flow in the left frontal lobe, the left thalamus, and parts of the right basal ganglia. An ultrasound scan revealed a 20-30% obstruction of Guilbeau's left carotid artery in May 1990.

Based on the SPECT scan, Guilbeau's history of exposure to Henry's adhesive in the mobile home, and Guilbeau's hypersensitivity to smells (cacosmia),[24] which Callender stated is characteristic in individuals who have been exposed to neurotoxins, especially solvents, Dr. Callender ruled out other possible causes for Guilbeau's symptoms, and diagnosed severe chronic toxic encephalopathy (permanent brain damage), vestibular dysfunction,

---

SPECT is the acronym for single photon emission computerized tomography, a brain imaging method which uses radiation tracers injected into the brain through the carotid artery to produce computer-generated color images of blood flow.

There was testimony that "osmia" means "to smell" and "caco" is a Greek word for "stool". Dr. Callender referred to an article defining cacosmia as nausea, headaches, and subjective distress in individuals exposed to neutral environmental odors.

and thalamic sensory syndrome, caused by exposure to the adhesive.[25]

Guilbeau was seen by Dr. Lisa Morrow, a Pittsburgh psychologist, in July 1989.[26]  Guilbeau reported to her that he smelled a strange, cool, burning odor emanating from an air vent underneath his desk on Saturday, August 16, 1986; that he had pain in his left wrist and sometimes in his right arm and shoulders; that smells such as perfumes burn his nose, make him weak and dizzy, and cause pressure in his head; that he has headaches at the same time every day; that he is often tired and does not sleep more than two to three hours a night; that he has a 30% loss in his lungs; that he has pains in his stomach and elsewhere 17-18 times a day; and that he suffered from nervousness, itching, sweating, dizziness, shaking, and hallucinations.

Dr. Morrow conducted tests, on which Guilbeau had high scores for somatic preoccupation, depression, hysteria, and anxiety.[27] Based on her examination and the history and symptoms reported to her by Guilbeau, Dr. Morrow opined that Guilbeau suffered a psychological injury or psychiatric disorder as the result of his

---

Dr. Callender testified that vestibular dysfunction was related to Guilbeau's symptoms of dizziness and panic attacks; and that thalamic syndrome is equivalent to sensory dysfunction, including hallucinations.

Dr. Morrow testified that she works with Dr. Callender, whom she met in 1988, and that Dr. Callender has referred patients to her, 18 of whom she is using in her research on persons who have been exposed to solvents.

She testified that she did not test for secondary gain desire, but that it was a possibility.

exposure to solvents in the adhesive.  She testified that she focused on the adhesive because of Guilbeau's sensitivity to other odors which, based on her experience, could have been caused only by solvent exposure.

Dr. Callender referred Guilbeau to Dr. Harper, a neurologist, who testified at trial as an expert in pain management, neurology, psychopharmacology, and addiction medicine.  Dr. Harper testified that Guilbeau described the repairs at the mobile home and reported that he started having problems on August 14, 1986; he complained of chemicals affecting his brain; pain, panic, and scare attacks; and visual problems; and he reported a major behavioral change, from being a successful salesman before the exposure to being ineffectual and depressed afterward.

Dr. Harper made no abnormal physical findings, but testified that Guilbeau complained of sensitivity to odors (cacosmia); he testified that cacosmia is fairly rare, and that he has seen it only in persons with a history of exposure to chemicals.  Harper testified that Guilbeau had a variety of interesting complaints that were complicated to interpret.[28]  Harper ruled out somatization disorder because there was a physical explanation for Guilbeau's

---

Harper testified that Guilbeau reported a lot of symptoms that doctors would consider to be fairly impossible:  a feeling of a chemical flowing into his brain from his neck; a cool, numb, itching feeling, then burning of the neck, and then a pain in his head; and a feeling that his brain was twisting inside.  Harper testified further that Guilbeau reported that he could smell chemicals coming out of his body at times, and that Mrs. Guilbeau agreed that she could smell them, too; that he experienced swelling in his left index finger, which traveled up into his forearm;  and that his spells could be set off by different smells or particular television commercials.

physical complaints, and concurred in Callender's diagnosis, based on Guilbeau's description of his history of exposure to the adhesive, the symptoms he reported after the exposure, and the SPECT scan of his brain, which showed abnormal areas of decreased circulation in parts of his brain.

Henry's expert, Dr. Berger, examined Guilbeau the weekend before the trial in January 1994. He testified that he found chronic lung disease, clubbing of the fingernails (a sign of advanced emphysema and bronchitis), gastro-intestinal disease, bloating, poor circulation, and an irregular heart beat (a sign of early atherosclerosis).[29] He performed neurological tests, and testified that the results clearly showed that Guilbeau has no brain dysfunction, but has a personality problem of using tantrums and exaggerating his regular conditions to manipulate people.

Mrs. Guilbeau testified that, other than problems with his sinuses and surgery for a dislocated knee, Guilbeau had no serious health problems, seizures, or allergies prior to August 1986; and that, before the mobile home repairs, Guilbeau behaved normally, and she and Guilbeau were happy and had a very good relationship; but afterward, he has been scared, depressed, aggravated, and

---

Dr. Berger testified that he observed some malingering when Guilbeau "made believe" his legs were paralyzed, fell off a chair, and called it an attack or some kind of brain seizure; that Guilbeau tried to fake a reaction to one of the tests of his reflexes; and that Guilbeau was trying to cover up his knowledge of his blood sugar problem by refusing to eat before a urine test, and then refusing to provide a urine sample the next morning after he had eaten breakfast.

angry, and has temper tantrums.[30]  There was evidence, however, that Guilbeau attempted suicide in 1969, when he took an overdose of sleeping pills; he was honorably discharged from the Army after serving two and one-half months, because of a knee problem, but the discharge was authorized by a psychiatrist; he had complained about nervousness and anxiety as far back as 1972, and had been prescribed tranquilizers;[31] he is a heavy smoker, having smoked from one and one-half to four packs of unfiltered cigarettes a day for over 30 years, and suffers from chronic lung disease, frequent upper respiratory infections, bronchitis, and wheezing, dating back to 1964;[32] his blood sugar was high in 1971 and 1984; he had high triglycerides, high cholesterol, and high uric acid; he had been

_____

Duplechin testified that, before he was exposed to the adhesive, Guilbeau was never sick and never complained, but that after the carpet was installed, Guilbeau said that he felt dizzy at times; and when he saw Guilbeau about a year before the case was tried in January 1994, Guilbeau looked bad and had lost a lot of weight.  Shaw testified similarly that before the exposure, Guilbeau was healthy, fun to be around, courteous, and humorous; that he was not a chronic complainer; that he had never seen him have temper tantrums, fainting spells, or dizziness; but that when he saw Guilbeau about two years before the trial, he could not believe it was he because he looked so bad and had lost so much weight.  Thibodeaux testified that before August 1986, Guilbeau was a top-notch salesman who had a good personality, but that afterward he looked "like death warmed over" and did not have "the old get-up-and-go".  Leonard Brown, a former co-worker, testified similarly that Guilbeau had nothing wrong with him before the exposure, but that Guilbeau told him about trouble with his head, dizziness, and lack of coordination after the exposure.

Dr. Clause, who prescribed the tranquilizers, testified that he did not consider Guilbeau to be a chronically nervous or anxious person; and saw no sign in 28 years that he was suffering from a psychiatric disorder.

Mrs. Guilbeau testified that Guilbeau's cigarettes cost about $90 per month.

treated for rectal bleeding and for prostatitis on several occasions; he was treated for impotence in 1984; he suffered from gastritis; he went to a doctor in 1976 after claiming to have been nearly struck by lightning;[33] and in 1974 he went to a hospital emergency room complaining of toxic exposure to rice fumigation, and was diagnosed as having a possible allergic reaction. (Contrary to the dissent's suggestion, by summarizing this evidence, aspersions are not cast on Guilbeau's sanity, nor are improper inferences drawn.)

On August 14, 1987, the Guilbeaus filed suit against Henry and others, alleging that, in August 1986, when the new sub-flooring and carpet were installed in the mobile home where Guilbeau worked, he became ill after being exposed to formaldehyde gas released from particle board flooring, which synergistically combined with toxic fumes emitted from carpet adhesive manufactured by Henry.[34] Eventually all of the defendants except Henry were dismissed, and the case finally proceeded to trial in January 1994 on its 13th setting, with the Guilbeaus being represented by their third set of lawyers since suit was filed.[35]

---

Mrs. Guilbeau testified that Guilbeau told her that the lightning episode felt like he was glued down, and snapped his lower back.

The complaint was amended to add additional defendants (manufacturers of formaldehyde products and their insurers) in March 1988, and again in January 1990.

The Guilbeaus are represented by different counsel on appeal.

In a motion to dismiss filed in September 1993, Henry stated that, before the fall of 1992, the Guilbeaus agreed to settle with Henry for a nominal amount, but later reneged. At a hearing on

At trial, the district court denied Henry's motions for judgment as a matter of law, as discussed *infra*. In response to interrogatories, the jury found that Henry's adhesive was defective because it was unreasonably dangerous for normal use or because it failed to include an adequate warning; and that the defective condition of the adhesive was the legal cause of Guilbeau's injuries. It awarded $2,000,000 to Guilbeau and $900,000 to Mrs. Guilbeau.

The district court denied Henry's post-trial motion for judgment as a matter of law or, in the alternative, for a new trial; but found that the interrogatory regarding Mrs. Guilbeau's damages was erroneous as a matter of law because, although her only claim was for loss of consortium, it allowed the jury to award damages to her for many of the same types awarded her husband. The court concluded that the maximum amount that properly could have been awarded for loss of consortium was $50,000; it denied Henry's motion for new trial on the issue of loss of consortium conditioned on Mrs. Guilbeau's acceptance of the remittitur. The remittitur was agreed to.

---

December 13, 1993, the district court announced that it was going to dismiss the case, because the Guilbeaus' attorneys were not prepared to go to trial, which was set for that day. The court recalled the dismissal, however, to avoid penalizing the Guilbeaus for their counsel's conduct. However, the court ordered one of the Guilbeaus' attorneys to pay $11,186 to Henry as sanctions, to cover Henry's expenses in preparing for trial for the December setting.

Henry contends that the district court erred (1) by denying it judgment as a matter of law, in light of the absence of scientific evidence that the adhesive was either defective or caused Guilbeau's alleged injury; and (2) by denying it a new trial, because the Guilbeaus' trial counsel engaged in improper trial conduct and made improper closing arguments to confuse and inflame the jury. In addition to contesting the issues raised by Henry, the Guilbeaus assert that, even if the evidence were insufficient, the judgment should be affirmed because the claimed erroneously excluded evidence is sufficient; that the remittitur should be reversed; and that the district court applied an erroneous rate and date of accrual in awarding prejudgment interest. The Stevens firm contends that the court erred by failing to award attorneys' fees to it (any recovery by that firm is contingent on judgment being awarded the Guilbeaus); the Guilbeaus respond that the firm is not entitled to any recovery.

Before reaching whether judgment as a matter of law should have been granted, whether the issue was preserved in district court must be determined.

A.

The Guilbeaus claim that Henry failed to preserve the sufficiency of the evidence question. They maintain that the only ground stated by Henry in seeking judgment as a matter of law was on "unreasonable dangerousness" only as to the failure to warn theory of liability, and that Henry failed to challenge the

evidence of exposure, other theories of defect, or causation.

At the conclusion of the Guilbeaus' case-in-chief, Henry moved for judgment as a matter of law, stating:

> [U]nder Federal Rule 50, I'll move for judgment as a matter of law on the issues of unreasonably dangerous [*sic*]. There's been no showing by plaintiffs that this product is unreasonably dangerous, and there's been no showing by these plaintiffs that this product should have had a warning when it was manufactured in 1986 or ... when the material safety data sheet was promulgated in 1985; you've heard no showing from the plaintiffs on those issues. This has to do with a product that was manufactured and distributed in early 1986 and used by the consumer in the eighth month of 1986. You have no demonstration either in fact or in law as to those issues, and under Rule 50 I move for judgment as a matter of law on those grounds. May I add, Your Honor, ... that the expert which they propounded on all of those issues, by his own admission, only became an expert on this in 1990, four years after the product was manufactured.

The Guilbeaus responded that there was evidence from which the jury could find that the product was defective because of the absence of the warning, and stated that their expert

> also expressed the opinion that it should not have been manufactured with pentachlorophenol and that it shouldn't have had -- it could have been manufactured without the pentachlorophenol, because all pentachlorophenol did, a very dangerous, highly dangerous chemical, was to extend the shelf life of the product. *So, we've got a real fact issue on those two issues, manufacturing defect which rendered the product unreasonably dangerous* and failure to warn which rendered the product unreasonably dangerous. We did also mention the failure to test.

(Emphasis added.)

- 24 -

The court took the motion under advisement "without prejudice to the rights of either party to bring a similar motion at the end of the evidence".  Although Henry's renewal of the motion is not transcribed, a minute entry reflects that the court denied Henry's motion, at the close of all the evidence, re-urging its motion for judgment as a matter of law.

A motion for judgment as a matter of law "may be made at any time before submission of the case to the jury" and "shall specify ... the law and the facts on which the moving party is entitled to the judgment".  FED. R. CIV. P. 50(a)(2).  The purpose of that requirement "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment".  FED. R. CIV. P. 50, advisory's committee's note (1991 amendment); *see also* **MacArthur v. University of Tex. Health Center**, 45 F.3d 890, 897 (5th Cir. 1995) (Rule 50(b) "serves two basic purposes:  to enable the trial court to re-examine the sufficiency of the evidence as a matter of law if, after verdict, the court must address a motion for judgment as a matter of law, and to alert the opposing party to the insufficiency of his case before being submitted to the jury").

Although Henry's motion could (and should) have been more specific, it was adequate, *inter alia*, to preserve the issue of sufficiency of the evidence of product defect.  Despite the Guilbeaus' protests to the contrary, they were not prejudiced or "sandbagged" by Henry's failure to articulate with more precision

- 25 -

the grounds for the motion.  Although the Guilbeaus characterize this as a failure to warn case, that issue was not the most prominent one at trial; by far, the bulk of the evidence related to defect and causation.  Review of the entire record leaves no doubt that the most significant issues were whether Henry's product was capable of causing, and did in fact cause, the alleged injuries.  As the court stated at a pre-trial hearing on December 13, 1993, "[t]here's really one issue in this case and that's all; it's cause".  The court reiterated that fact on the eighth day of trial, in the midst of Henry's case:  "That's what this lawsuit is, to see whether this [adhesive] or some other thing that was present that brought this result to Mr. Guilbeau."

Moreover, as shown by his quoted comments about pentachlorophenol in responding to the motion, the Guilbeaus' counsel demonstrated that he knew exactly on what grounds the motion was based.  But, especially, this is reflected also by the fact that earlier, during the Guilbeaus' case-in-chief, their counsel inquired of Dr. Callender: if the jury was asked to determine whether the product was defective ("unreasonably dangerous"), was it because it contained pentachlorophenol?  Dr. Callender responded in the affirmative.  The Guilbeaus' counsel was fully aware of the bases for the motion.

B.

Because Henry preserved its challenge to the sufficiency of the evidence, the denial of its motion for judgment as a matter of law is reviewed under the well-known standard from ***Boeing Co. v.***

***Shipman***, 411 F.2d 365 (5th Cir. 1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence -- not just that evidence which supports the non-mover's case -- but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury.... However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

***Id***. at 374-75.[36]

This diversity case, to which Louisiana law applies, apparently was presented to the jury solely on a strict products

---

As stated, this standard requires review of all of the evidence that was before the jury. Excerpts from several depositions were read to the jury; in some instances, the excerpts were transcribed, but in others they were not. Counsel for both sides apparently were oblivious to that fact; although they stated where reading began, they frequently did not state where it stopped before skipping to the next excerpt. In some instances, this might preclude review of the sufficiency of the evidence. In this case, it does not, because the entire depositions from which excerpts were read were admitted into evidence, although not given to the jury during their deliberations. These depositions have been reviewed; even if read to the jury in their entirety, they do not contain sufficient admissible evidence to support the verdict. None of the deponents were expert witnesses, and none of the depositions at issue contain any testimony about the decisive factual dispute -- pentachlorophenol and sodium pentachlorophenate.

liability theory, both parties having agreed to omit negligence and comparative negligence instructions.[37]   This case was commenced prior to the effective date of the Louisiana Products Liability Act of 1988, La. Rev. Stat. §§ 9:2800.51-2800.59 (effective September 1, 1988).  To recover from a manufacturer under that theory, the applicable Louisiana law required the plaintiffs to "prove (1) that the injury or damage resulted from the condition of the product; (2) that the condition made the product unreasonably dangerous to normal use; and (3) that the condition existed at the time the product left the control of the manufacturer or supplier".  **Bell v. Jet Wheel Blast**, 462 So. 2d 166, 168 (La. 1985); *see also* **Halphen v. Johns-Manville Sales Corp.**, 484 So. 2d 110, 113 (La. 1986).

"An essential element of a plaintiff's case ... is proof that the defendant's product was unreasonably dangerous to normal use". **Halphen**, 484 So. 2d at 113.  "A defective product is one that is `unreasonably dangerous to normal use'".  **Bloxom v. Bloxom**, 494 So. 2d 1297, 1302 (La. App. 2d Cir. 1986) (quoting **Weber v. Fidelity & Casualty Ins. Co. of N.Y.**, 259 La. 599, 250 So. 2d 754, 755 (La. 1971)), *aff'd*, 512 So.2d 839 (La. 1987).  "`Normal use' is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product".  **Bloxom v. Bloxom**, 512 So. 2d 839, 843 (La. 1987).  Obviously, if a product is not unreasonably dangerous, there is no need to address causation.  (The dissent concludes that the evidence is sufficient to support a finding that Henry's adhesive caused Guilbeau's alleged injuries, and that the

The charge was not transcribed and is not in the record.

adhesive was unreasonably dangerous because Henry failed to warn about the danger posed by organic solvents. Because there is insufficient evidence that the organic solvents made the adhesive defective, it is unnecessary to address causation or the lack of a warning. In any event, the insufficient proof of causation in regard to the organic solvents is discussed *infra*.)

Henry contends that the Guilbeaus failed to prove that the adhesive was defective because (1) their experts' opinions were based on the presence in the adhesive of chemicals that it did not contain; and (2) Guilbeau's alleged reaction is idiosyncratic, because, although the adhesive at issue has been manufactured and sold for 20 years, no one but Guilbeau has ever claimed to have been injured by it.

1.

Addressed first is whether the product was defective because it contained pentachlorophenol and, then, whether organic solvents are a basis for finding a defect.

a.

Henry asserts that the evidence is insufficient to prove that the product was defective, because the Guilbeaus' expert witnesses' opinions are based on the erroneous conclusion that the adhesive was defective because it contained *pentachlorophenol*, when it instead contained *sodium pentachlorophenate*. The Guilbeaus counter that Henry's witnesses admitted that the product contained pentachlorophenol. This response is facially correct; but, as discussed *infra*, that evidence is insufficient to support a

conclusion that the adhesive contained pentachlorophenol. Moreover, as also discussed *infra*, the Guilbeaus failed to present any competent evidence that pentachlorophenol is a form of sodium pentachlorophenate, that sodium pentachlorophenate has the same toxic properties as pentachlorophenol, or that sodium pentachlorophenate is volatile.

Dr. Reddy, the director of the laboratory for Chemtex, which analyzed samples of the adhesive, testified for the Guilbeaus as an expert witness in industrial hygiene and chemistry.[38] He testified that two samples were tested: a one-gallon metal can, and a three-and-one-half-gallon plastic container. Previous testimony by Mrs. Guilbeau and the co-workers who installed the new carpet established that the three-and-one-half-gallon plastic container was the one that contained the adhesive used to install the carpet in the mobile home.[39] The Guilbeaus' counsel admitted that the one-

The samples were picked up by The Subra Company from one of the Guilbeaus' attorneys on September 10, 1990, approximately four years after the incident in issue. Dr. Subra testified that her company did not have the instrumentation to perform the analysis, so she sent the samples to Chemtex.

On cross-examination, Shaw testified that Mrs. Guilbeau obtained the three-and-one-half-gallon container of adhesive possibly about two years after it was used in August 1986 to install the carpet. After the noon recess, however, during which the Guilbeaus' counsel asked Shaw about the circumstances under which the container was given to Mrs. Guilbeau, Shaw testified on redirect that he was mistaken about the date, and that he had given the container to Mrs. Guilbeau in September 1986; he said that he remembered her saying that Dr. Wong wanted the container so that he could analyze its contents. (Counsel's lunch hour discussion with (some might say coaching of) this witness is a typical example of the numerous problems arising out of the conduct of counsel throughout the trial.) Mrs. Guilbeau testified that, about two weeks after the alleged exposure, Dr. Wong asked her to bring the container of adhesive; that Shaw gave her the container of

gallon can of adhesive was newer than the three-and-one-half-gallon container, apparently having been purchased shortly before the testing which was conducted in September 1990.

According to Dr. Reddy, both samples were tested for 40 different volatile organic compounds; *but, pentachlorophenol was not among the items for which the samples were tested*. Significant amounts of four of the compounds tested for were found in the three-and-one-half-gallon container: ethylbenzene, methylene chloride, xylene, and 2-Butanone (methyl ethyl ketone). The one-gallon can contained significant amounts of those same four compounds, as well as toluene and trichloroethane. Toluene and trichloroethane were not detected in the three-and-one-half-gallon container; the laboratory did not test it for toluene. Reddy testified that all of these compounds are found in gasoline and most petroleum distillates.

In their case-in-chief, the Guilbeaus presented the deposition testimony of Lawrence Balling, Henry's technical director. A list of ingredients produced by Balling at that deposition was admitted into evidence; it shows that #270 adhesive contains 45-55% water, 2-8% petroleum distillate; 30-40% synthetic rubber/resin binder, 15-20% clay, 1-3% soap, 0.2% pentachlorophenate, and a trace of ammonia. (The record does not support the dissent's statement that

---

adhesive, and she brought it to Dr. Wong; that, after the visit, Dr. Wong did not want the adhesive; that the container was locked in the shed at her home until she took it to one of their lawyers, who had it tested; and that the container was later taken to their next lawyer. Guilbeau's diary reports that Dr. Wong examined him on September 4 and 5, 1986.

"Henry refused to disclose the glue's ingredients until midway through trial".  It reflects, instead, that the Guilbeaus' trial counsel were well aware that Henry had been willing to produce the formula for the adhesive, with an appropriate protective order, since 1989.  It was not until mid-trial that the Guilbeaus' counsel requested the formula pursuant to a protective order.)

When the Guilbeaus' counsel first asked their expert, Dr. Callender, to identify the ingredients in the adhesive, he referred to the material safety data sheet and stated correctly that it contained "sodium pentachlorophenate".[40]  Counsel then asked, "Is that what is properly known as P.C.P., pentachlorophenol?"[41] Callender responded, "Well, there's -- using initials can be confusing, because there's -- pentachloro -- it's pentachlorophenol.  It's a form of pentachlorophenol".[42]  From that

---

Dr. Callender was board certified in internal medicine.  When he first saw Guilbeau, he operated a walk-in clinic.  He testified that he became a toxicologist, and stopped holding himself out to the public as a walk-in clinic, two or three years prior to the January 1994 trial.  Dr. Callender conceded that he was not a chemist or industrial hygienist, and he was not tendered as an expert in either of those fields.  Over Henry's objection to Dr. Callender testifying as an expert in any field other than internal medicine, the district court accepted him as an expert in that field as well as neurotoxicology and occupational medicine.

"PCP" is the recognized abbreviation for phencyclidine hydrochloride, a controlled substance which causes hallucinations and serious psychological disturbances.  R. SLOANE, THE SLOANE-DORLAND ANNOTATED MEDICAL LEGAL DICTIONARY 545 (1987).  However, plaintiffs' exhibit 100, excerpts from a book on neurotoxicity, uses "PCP" as the abbreviation for pentachlorophenol; and so does an exhibit attached to Henry's reply brief.

Perhaps because he is not a chemist, Dr. Callender never explained the basis for his statement that sodium pentachlorophenate is a form of pentachlorophenol, nor did he testify about any of the characteristics or toxic properties of

point through the conclusion of his testimony on direct examination, Dr. Callender and the Guilbeaus' counsel continued to refer to the ingredient, inaccurately, as "pentachlorophenol". Callender testified at length about the toxicity of pentachlorophenol, its capacity to cause brain damage and other symptoms, and the effects of synergism when pentachlorophenol is added to solvents such as those detected in the samples of Henry's adhesive.

When asked whether the adhesive could be used safely "in an enclosed situation like this ... mobile home", Dr. Callender responded that it could not, because pentachlorophenol lasts a long time, and is very toxic; speculated that it probably also contained dioxin, because the method used to produce pentachlorophenol at the time usually resulted in a substantial amount of contamination from dioxins;[43] and testified that the adhesive should have contained a warning label including the following statement:

> [T]his product contains volatile organic compounds, chemical solvents, pentachlorophenol and associated contaminants such as dioxins and difurans. These chemicals and solvents can be hazardous to human health.

sodium pentachlorophenate.

The Guilbeaus' counsel interrupted Dr. Callender at this point, and got him to agree that dioxin is "the chemical that was in the Agent Orange that we hear about". Dr. Callender then testified that "dioxin is probably the most toxic compound known, and it's very often present in pentachlorophenol in amounts up to 20, 25 percent depending on the way it was produced, unless you're dealing with a very special production where they purify it". The Guilbeaus produced no evidence that sodium pentachlorophenate has ever been contaminated by dioxins or any other substance; this line of questioning is yet another example of the egregious conduct by the Guilbeaus' trial counsel.

> The contaminants found in commercial grade pentachlorophenols is [*sic*] considered to be extremely toxic in very small amounts....

Dr. Callender opined that "[p]entachlorophenol is a major actor in the toxicity of this product"; and, as noted earlier, that the product was unreasonably dangerous and defective because it contained pentachlorophenol:

> Q.  ... If the jury would be asked about ... whether or not the product was unreasonably dangerous as manufactured and defining unreasonably dangerous as being a danger that's basically unreasonable, what would your opinion be?
>
> A.  My opinion, that it would be --
>
> Q.  With the pentachlorophenol in it.
>
> A.  With the pentachlorophenol, that the danger would be pretty much unavoidable, but it's unreasonable.
>
> ....
>
> Q  .... If the jury is asked whether or not the product is defective because it contains -- because it's unreasonably dangerous and describes unreasonably dangerous as some defect that's unreasonable and could be eliminated and the product still have usability -- I believe you said your opinion is that it is defective because it contains pentachlorophenol; is that correct?
>
> A.  Right.

This testimony demonstrates undeniably that the whole thrust of the Guilbeaus' theory was based on their incorrect claim that the adhesive contained pentachlorophenol.  In expressing his opinion that the product was unreasonably dangerous and defective, Dr. Callender never mentioned organic solvents or any other ingredients, only pentachlorophenol.

- 34 -

On cross-examination, Dr. Callender testified that pentachlorophenol was the most dangerous component of the adhesive. Henry also cross-examined him about a 1991 published article reporting on a study by Dr. Callender in which Guilbeau was one of the subjects, and in which Dr. Callender described a "[o]ne year exposure to two levels of formaldehyde and phenol from particleboard.  1986, acute high level of occupational exposure for several workdays to strong fumes of formaldehyde, phenol, and glue containing tetrachlorophenol, dichlorophenol, ammonia, pentachlorophenol, methanol, petroleum distillates, ethyl benzene, methylene chloride, xylene, methyl ethyl ketone, toluene".  Dr. Callender acknowledged that some of the chemicals listed in the article were not in the adhesive, but were typically found in pentachlorophenol and petroleum distillates, based on his consultation with a toxicologist.

Henry called Balling as a witness. Balling testified that the petroleum distillate, or solvent, is ordinary paint thinner, commercially available on store shelves in 1986; and that each gallon of adhesive contains about a cupful of solvent.  He testified that the product contains *less than two tenths* of one percent of sodium pentachlorophenate, a preservative used to kill bacteria in the water and prolong shelf life; that sodium pentachlorophenate is not volatile and does not evaporate; and that although the amount used in the adhesive was below the level required to be disclosed on the material safety data sheet (MSDS) in 1986, Henry reported both petroleum distillates and sodium

pentachlorophenate on its 1985 MSDS.

Despite Balling's testimony, and the MSDS, which listed sodium pentachlorophenate, not pentachlorophenol, as an ingredient, the Guilbeaus' counsel repeatedly asked questions about pentachlorophenol during cross-examination of Balling, at times referring to it as "PCP". At times during cross-examination, Balling was careful to distinguish between the two substances, and did not allow himself to be misled by the Guilbeaus' counsel's persistent references to pentachlorophenol.

For example, one of the first questions on cross was, "... would you agree with me that it was not necessary to include the pentachlorophenol ... in order for it to be an effective adhesive?"; Balling replied, "It would have been an effective adhesive without the sodium pentachlorophenate, but it would not have good shelf life". When asked whether Henry bought laboratory-purified pentachlorophenol or the technical grade, Balling replied, "... I couldn't tell you what grade we bought.... We bought the chemical sodium pentachlorophenate". And, when asked if he was aware that pentachlorophenol was contaminated by dioxins, he testified that he was "not aware of the fact that the sodium pentachlorophenate was contaminated with dioxins". When asked whether he was aware that pentachlorophenol becomes many times more hazardous and much more readily absorbed if it is in the presence of an organic solvent, he replied, "Yes, I do know that; but the sodium liminal, it's not a problem". When questioned about the volatility of pentachlorophenol when dissolved in organic solvents,

Balling testified that sodium pentachlorophenate was soluble in water, and that it would remain if the water evaporated. Balling testified unequivocally that sodium pentachlorophenate is not volatile when dissolved in water. When questioned about pentachlorophenol inhalation studies resulting in injuries and deaths, Balling replied, "No, I'm not aware of that, and we put the sodium pentachlorophenate in there".

At other times, however, Balling seemed oblivious to the distinction, and failed to correct the Guilbeaus' counsel's persistent references to pentachlorophenol. For example, when asked whether "pentachlorophenol" has been found to be a hazardous substance, he replied, "It is in the hazardous substance section of the M.S.D.S. I am just aware that it is hazardous in the amounts of two-tenths of a percent or over."[44]

---

When asked whether Henry conducted any tests "to determine what was contained in the pentachlorophenol that y'all purposely dumped into the glue to extend its shelf life", he replied:

> We used an amount that wasn't required even to be put on an M.S.D.S., so I didn't really look into it any further than that. And I'm sure when the M.S.D.S. ... was set up, I'm sure if there were contaminants in it, they were taken into consideration. Maybe that's why the figure was so low.

When the Guilbeaus' counsel asked whether a list of components, including "ethylene benzene", methylene chloride, toluene, "trichlorethylene", xylene, MEK, pentachlorophenol, and styrenebutadiene, were in the product, Balling replied "yes", without distinguishing between the components he had previously testified were in the product and those which he had testified were not in it. Later, counsel asked: "Now, you have also said that pentachlorophenol was in there; right?" Balling replied, "[y]es".

The Guilbeaus' expert chemist, Dr. Subra, was allowed to be called as a rebuttal witness during the middle of the defense's case-in-chief; the Guilbeaus' counsel stated that it was for the sole purpose of rebutting testimony "on the volatility of PCP". But, Dr. Subra testified solely about the volatility of pentachlorophenol when used as a wood preservative; she did not testify about sodium pentachlorophenate. She opined that pentachlorophenol, which the Guilbeaus' counsel called "PCP", is volatile, and would be more likely to go into the air if mixed with volatile chemicals in the adhesive than by itself; and that it was more toxic when combined with other chemicals than when considered separately.

Considering Balling's testimony in its entirety, and in light of all the other evidence, including the MSDS and other exhibits, the Guilbeaus' contention that Balling admitted that pentachlorophenol was in the product is unwarranted. True, Balling was at times careless, failing to correct the Guilbeaus' attorney every time counsel referred to pentachlorophenol as an ingredient of the adhesive. And, Henry must shoulder some of the blame. Not only did its counsel fail to object to the numerous references to pentachlorophenol; it also did not conduct redirect examination of Balling, in which it could have cleared up the discrepancies. (In any event, failure to object to use of the term "pentachlorophenol", for which the dissent asserts Henry could not pass plain error muster, is different from relying for defect on an ingredient that was not in the product.)

- 38 -

But, the Guilbeaus' trial counsel must bear the lion's share of the responsibility, because their questions consistently were about pentachlorophenol, even though the MSDS stated that the product contained sodium pentachlorophenate, not pentachlorophenol, and Balling had testified on direct examination that the product contained sodium pentachlorophenate.  Whether counsel acted out of ignorance, or in an effort to mislead the jury and trick Balling (it certainly appears to be the latter) is unknown; but it makes no difference because, irrespective of their motive, the questions, which assumed a fact that was not in evidence, are not evidence.

In any event, the gist of Balling's testimony is clear when considered in the proper context: the adhesive contained sodium pentachlorophenate.  This conclusion is reinforced by the testimony of Henry's expert witness, Dr. Berger, who was accepted as an expert in environmental health, with sub-specialties in chemistry, industrial hygiene, toxicology, pathology, general medicine, psychiatry, neuroscience, and occupational medicine.

Although Dr. Berger's testimony on direct examination contains several references to pentachlorophenol, on redirect he cleared up any possible confusion about which substance was in Henry's adhesive:

> Q.  .... Have you done some research in the past on sodium pentachlorophenate?
>
> A.  Sure.  First of all, we heard some testimony about pentachlorophenol. That's not in this case.  It's the salt, sodium pentachlorophenate.  It's a completely different compound.  It's a non-volatile salt. I have the MSDS from the people who made it, their own analytical chemists, saying that

it's perfectly inert and has no vapor pressure. And I also have some documents that attest to the low ... volatility. In fact, it needs steam ... to get it to volatilize. And it's been studied by the world health organization. And there are no reported cases of any nerve injury, even in workers who make it in all of North America.

Moreover, when asked whether sodium pentachlorophenate in sufficient amounts will attack the body, he replied:

You'd have to paste it on the body. It can't leave the ground. If you put it on the ground, it's dead there. It's not going to move. It doesn't volatilize. The MSDS says it has no vapor pressure.... Your body would have to find it and come in contact with it. [If it became toxic to the body, it affects] [t]he liver, the heart, and the kidneys. It's not known to affect the nervous system at all, as studies have shown. It's never been associated in North America or Europe with any disease either of the central or peripheral nervous system in workers who make it, who are the most exposed of all.... [T]hey can burn their skin. They can get kidney problems.... Their livers tend to have elevated enzymes, and they're monitored for that. But not in your nervous system.... That's why this is a puzzle to me, why in this case it's being associated that way.

Finally, noting the failure of the Guilbeaus' chemical expert, Dr. Subra, to distinguish between sodium pentachlorophenate and pentachlorophenol in her testimony, discussed *supra*, counsel asked Dr. Berger whether the two compounds are identical; he replied, "Of course not". Dr. Berger explained the difference as follows:

If you take sodium, which is explosive on you, and chlorine gas, which will burn your eyes, that's very different from sodium chloride, the salt of them, which tastes good and we're made of.... Now, in this particular case the only product is the salt. It's a different compound, and its manufacturers and analytical chemists have certified to the

government that it doesn't vaporize. It has no vapor pressure. And my knowledge, in the industrial community, is the same, and I have looked in texts and that's the same. Pentachlorophenol is an entirely different substance.

I heard Ms. Subra's testimony, and I wouldn't say that there's any text that agrees with her. The conference of governmental hygienists says it takes steam to evaporate pentachlorophenol. And steam is 220 -- 215, 212 degrees Fahrenheit.

The compound here is inert, has no vapor pressure, isn't volatile; that's sodium pentachlorophenate. And after the adhesive is laid, it diffuses in the oil and stays there to kill funguses, algae, snails, stuff like that.

Dr. Berger's testimony was unrebutted. The only evidence offered by the Guilbeaus in an attempt to rebut it was the testimony of Dr. Callender. Although he is not a chemist and was not accepted as an expert witness in that field, he was asked (without objection) only whether "pentachlorophenol when in the form of sodium pentachlorophenate" will evaporate. He replied that "it does volatilize to a certain degree and in the solid form", but then went on to testify about pentachlorophenol, not sodium pentachlorophenate, opining that Guilbeau was exposed to pentachlorophenol, and that the volatile organics and the pentachlorophenol in Henry's adhesive caused Guilbeau's brain damage.

As stated, Dr. Callender never explained the basis for his testimony that sodium pentachlorophenate is a form of pentachlorophenol, and never testified about the characteristics or toxicity of sodium pentachlorophenate. (In fact, at oral argument,

the Guilbeaus' counsel admitted that no one testified that sodium pentachlorophenate would dissolve in organic solvents and produce the pentachlorophenol radical.)

Based on the foregoing, the verdict cannot be sustained under the Guilbeaus' theory (claim) that the product was defective because it contained pentachlorophenol. As discussed, neither sodium pentachlorophenate nor pentachlorophenol were detected by the laboratory that the Guilbeaus' attorneys retained to test samples of the adhesive for 40 different volatile organic compounds. The Guilbeaus never disputed Henry's evidence that sodium pentachlorophenate and pentachlorophenol are different substances, and failed to present any testimony by a qualified expert witness that sodium pentachlorophenate is a form of pentachlorophenol, that it has the same toxicity as pentachlorophenol, or that the amount of it in Henry's adhesive was capable of causing Guilbeau's alleged injuries. The dissent agrees that "there is no evidence that the glue contained pentachlorophenol" and, therefore, "any testimony based upon the presence of pentachlorophenol cannot support the verdict".

b.

The Guilbeaus contend erroneously that, irrespective of whether the product contained pentachlorophenol, they proved that it was defective because of organic solvents.[45] Although they

The dissent, in discussing the evidence of causation, relies on Dr. Harper's opinion that Henry's adhesive contained organic solvents which cause toxic encephalopathy. Although it is not necessary to address causation, it bears noting that Dr. Harper conceded that, although he was told that Guilbeau was exposed to

presented some evidence about the toxicity of ethylbenzene, methylene chloride, xylene, and methyl ethyl ketone, which their testing laboratory found in the sample of adhesive to which Guilbeau allegedly was exposed, their primary focus was on pentachlorophenol, and the synergistic effects of it in combination with the other ingredients.[46]

As stated, Dr. Callender testified that pentachlorophenol was a "major actor" in the toxicity of the adhesive, and that it was unreasonably dangerous and defective because it contained pentachlorophenol.  And, in closing argument, the Guilbeaus' counsel told the jury:  "They shouldn't have had the PCP in the product, therefore, the answer to Question No. 1 [whether the

---

one and one-half gallons of "solvent" (not "adhesive"), *he did not know* how much "solvent" was in Henry's adhesive (according to Balling's uncontradicted testimony, each gallon of adhesive contained only one cupful of solvent) and could not say how much of it entered Guilbeau's brain, because such calculations are not very helpful and can rarely be made in any meaningful way.  Henry's adhesive was advanced by Dr. Harper as the most likely cause of Guilbeau's problems based on the history of exposure reported to him by Guilbeau.  Dr. Harper acknowledged that, if Guilbeau had said nothing about the adhesive and had mentioned only exposure to carpet, then his opinion would be that the carpet was the most likely cause of Guilbeau's toxic encephalopathy.  None of Guilbeau's experts' opinions are supported by any scientific evidence based on a dose-response relationship even remotely comparable to the facts of Guilbeau's exposure to the ingredients in Henry's adhesive.

Although they also presented evidence about the toxicity of toluene and trichloroethane, there was no evidence that those compounds were present in the bucket of adhesive that was used to install the carpet in the mobile home.  The Guilbeaus' testing laboratory found those ingredients only in the one-gallon can of adhesive, which was purchased by the Guilbeaus' counsel.

- 43 -

product is unreasonably dangerous] is `Yes'".[47]

2.

In the alternative, Henry contends that, as a matter of law, the Guilbeaus cannot establish that the adhesive is unreasonably dangerous on the basis of a single adverse reaction by one individual out of millions of applications of the same product under similar conditions.  The evidence shows that Henry has been making adhesives since 1933.  Henry's technical director, Balling, testified that #270 adhesive had been on the market for over 20 years, since it was developed in his laboratory in the 1970s, and is similar to other adhesives on the market in 1986 and at the time of trial.

The adhesive is made in 600-gallon mixers, the lids of which are never closed.  Although exposed to it on a daily basis, none of

---

Of course, closing argument is not evidence; but, the Guilbeaus' closing argument certainly underscores that the true thrust of their claim that the adhesive was defective was their unsupported assertion that it contained pentachlorophenol. Although their counsel referred briefly to Dr. Callender's testimony about the toxicity of the organic solvents in the adhesive, and to scientific articles relied on by Dr. Callender, documenting that long-term exposure to organic solvents can cause brain damage and the symptoms experienced by Guilbeau, the only chemical referred to specifically (other than one brief reference to ammonia) was pentachlorophenol.  The following is illustrative:

> And as Dr. Callender told you, it was a design defect to have the PCP in it.  They could have gotten something else to extend the shelf life, because PCP is so dangerous that in 1984 they condemned it.  And you heard the testimony on that, and there's a whole book on it that we've offered over here about PCP [referring, without objection, to 1993 government report which court had ruled inadmissible] and how dangerous it is.

Henry's chemists or the workers who make the adhesive in plants all over the country have ever reported any injury; and workers have retired in good health after 20-30 years. OSHA requires no breathing apparatus or masks for the mixer employees, and Henry's employees have not ever worn them or any special clothing. Balling testified that thousands of people use Henry's #270 adhesive on a daily basis, and that millions of gallons of it have been sold, but that no one other than Guilbeau has ever reported being injured by it.

Henry cites **Lemoine v. Aero-Mist, Inc.**, 539 So. 2d 712 (La. App. 3d Cir. 1989), for the proposition that a product is not unreasonably dangerous because someone has an idiosyncratic reaction to it. Lemoine, a legal secretary, returned to her office after lunch; while she was out, a pesticide had been sprayed in the office. *Id*. at 713. She became ill, and sued the pesticide manufacturer, distributor, insurer, and sales representatives. *Id*. The trial court found for the defendants, and the appellate court adopted its reasons, including that the product had been sprayed in homes and offices many times daily without serious effects, that Lemoine was not present when it was sprayed, and that a large quantity was not used. *Id*. at 714. Louisiana cases were cited for the propositions that the use of a chemical in the manufacture of a product, which causes an extremely rare allergic reaction, is not a defect; that there is no duty to warn against the possibility of an unusual or rare idiosyncratic sensitivity; and that, in view of Lemoine's rare susceptibility, it was not reasonably foreseeable

that she would have been injured.  *Id*. at 715.

The Guilbeaus understandably discount the absence of evidence of other injuries, contending that Henry's assertions of the lack of other complaints are false because of Thibodeaux's testimony that he was sickened as well when, after he took Guilbeau's place, he occupied Guilbeau's office, and that all of his customers "experienced the same problem from this very product".[48]  There was

At trial, one of the Guilbeaus' attorneys told the jury in closing argument not to be concerned about the fact that Guilbeau was the only person who had suffered an injury when the glue has been used by thousands of people:

> [Y]ou have enough evidence here ... to be able to infer from what you've heard on this witness stand and from the documents in evidence to know what would happen ... when other people did complain.  Look what happened when Mrs. Guilbeau complained.  She's been trying for seven years to get the facts of this case, to find out what was in the glue so she could take care of her husband who is sick.  And what has happened, "No, no, no." And now ... they've put their people on the stand to tell you there's no injury.  That's why there's no reported injuries....
>
> Well, of course, there's not any reports of hundreds that might have been injured because they deny in every case that anybody could be hurt by their glue, even though the literature says that organic solvents cause brain injury.
>
> ....
>
> And I suspect, as I told you, there's been a lot of these, because the way they have their records, nobody gets hurt by their glue.  So they can honestly state in a deposition, nobody has ever been reported, after thousands of gallons of this stuff, of being hurt.  I don't believe it.  I don't believe it.

The outrageousness of such argument speaks for itself.

no evidence that Thibodeaux ever reported his "sickness" to Henry. He testified that the smell made him sick (dizziness, burning eyes and nose), but he did not go to the doctor, took one afternoon off, and has felt fine ever since. Although Thibodeaux testified that customers complained or asked about the smell and that some of them had to go outside because of burning eyes, there is no evidence that any of the customers complained to Henry.

Finally, in equating the symptoms of Thibodeaux and his customers with those experienced by Guilbeau, the Guilbeaus have greatly exaggerated the evidence; there was no proof, or even any suggestion, that Thibodeaux or any of his customers have been diagnosed with chronic toxic encephalopathy or that they experienced problems remotely similar in degree to those of which Guilbeau complains.

The Guilbeaus do not even cite, much less attempt to distinguish *Lemoine*; they cited no authority, and research reveals none, for imposing liability under Louisiana law on the basis of a single injury to a product that has been used by thousands of people without any other reported injuries. Indeed, the authority is to the contrary. *See* **Booker v. Revlon Realistic Professional Products, Inc.**, 433 So. 2d 407, 410 (La. App. 4th Cir. 1983) (unusual or rare idiosyncratic sensitivity on plaintiff's part would not provide a basis for recovery or even a requirement of a warning from manufacturer); **Quiroz v. Max Factor, Inc.**, 264 So. 2d 263, 266 (La. App. 4th Cir. 1972) (*res ipsa loquitur* inapplicable where another reasonable explanation for plaintiff's scalp

irritation and hair loss was that she was unusually sensitive or allergic to defendant's hair straightening product, and that her rare idiosyncratic sensitivity, rather than a defect in the product, was the sole cause of her injury); ***Thomas v. Gillette Co.***, 230 So. 2d 870, 876 (La. App. 3d Cir.) (possibility of allergic reaction to manufacturer's hair relaxant was so remote and unlikely that manufacturer was under no duty to warn users or purchasers of such a possibility; *res ipsa loquitur* inapplicable because there was reasonable possibility that plaintiff's reaction was result of rare idiosyncratic sensitivity rather than product defect), *writ ref'd*, 255 La. 809, 233 So. 2d 249 (1970); ***Blalock v. Westwood Pharmaceuticals, Inc.***, 1990 WL 10557 at *2 (E.D. La. 1990) (product not defective if injuries result from rare or idiosyncratic reaction, nor is manufacturer obligated to warn against possibility of such a reaction; summary judgment granted for manufacturer because reaction was idiosyncratic where defendant had sold nearly one million units of sunscreen without a complaint except by plaintiff).[49] Even without considering the other problems with the

---

The dissent considers these cases inapplicable because of its conclusion that Guilbeau proved that he was injured because he was exposed to dangerous organic solvents, not because he had an idiosyncratic reaction. But, even assuming that Guilbeau's injury was caused by the organic solvents in the adhesive, that is not enough to prove that the product was defective. Under Louisiana law, a product is not defective merely because someone suffers an idiosyncratic injury after being exposed to it. Based on the evidence in the record, Guilbeau is the only person, among thousands who were exposed to the adhesive during its manufacture and use, who suffered such an injury. Accordingly, Guilbeau's injury is, by definition, idiosyncratic. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1123, 1124 (1986) (defining "idiosyncratic" as, *inter alia*, "peculiar to the individual"; defining "idiosyncrasy" as, *inter alia*, an individual hypersensitiveness, as

Guilbeaus' proof, this basis alone, on the facts in this case, would support reversal of the jury's verdict.[50]

3.

Two alternative bases are offered by the Guilbeaus for upholding the verdict.

a.

The Guilbeaus claim that the verdict can be affirmed on the ground that the adhesive was "unreasonably dangerous *per se*". They maintain that, if all products containing asbestos are unreasonably dangerous *per se* in Louisiana, it follows that this category "must include a product that is accompanied by absolutely no warning, and that contains methyl ethyl ketone, xylene, methyl chloride, ethyl benzene, and toluene -- as well as pentachlorophenol, which has been banned for the kind of use (in homes) to which it was put here". This contention is rejected for several most obvious reasons.

First, it is unclear whether the case was presented to the jury on this theory. Second, it is patently absurd for the Guilbeaus to compare Henry's adhesive to asbestos, when there is uncontradicted evidence in the record that thousands of persons have manufactured and used the adhesive for years and have not

---

to a drug or
food).

Henry maintains, as well, that even if Guilbeau's reaction were not considered idiosyncratic, no reasonable trier of fact could conclude that the risk of injury in this case outweighed the utility of the product. *See* **Halphen v. Johns-Manville Sales Corp.**, 484 So. 2d 110, 115 (La. 1986). It is not necessary to reach this issue.

reported injuries to Henry. But most important, as noted *supra*, there was no evidence that Henry's adhesive contained some of the above listed ingredients, much less that the quantities of those ingredients were sufficient to cause injury.[51]

b.

Next, the Guilbeaus contend that, even if the evidence presented to the jury is insufficient, the verdict should be upheld based on evidence that they claim the district court excluded improperly. They assert that the district court excluded erroneously a 1993 report by the United States government, showing the effects of ingredients in Henry's product, evidence of evacuation of a government building, and lawsuits by eight individuals, all of which were offered to rebut Henry's claim that there had been no complaints regarding its adhesive;[52] and that it erroneously excluded labels used by Henry after the date of Guilbeau's exposure, which represented that solvents and hazardous ingredients had been removed from the product and admitted that concentrated, prolonged inhalation causes brain damage, and were offered to impeach Balling's testimony that the product was

---

As discussed, Henry's product contained sodium pentachlorophenate, not pentachlorophenol. Sodium pentachlorophenate has not been banned, and has been authorized for use as a preservative; and there was uncontradicted evidence that Henry used it for that purpose in its adhesive. *See* 21 C.F.R. 175:105(c).

In their initial brief, the Guilbeaus also challenged the exclusion of a Henry floor covering complaint form; but, in their reply brief, they conceded that the complaint "concerns product performance, and it probably was within the trial court's discretion to exclude it".

innocuous and to rebut Henry's assertion that there was no scientific basis for Guilbeau's claim.

It cannot be determined whether the district court abused its discretion in refusing to admit the 1993 government report, the evidence regarding evacuation of a building, or the evidence of other lawsuits, because the Guilbeaus did not include that evidence in their proffers. Without knowing what ingredients were discussed in the 1993 government report, the circumstances regarding the evacuation of a building, and whether #270 adhesive was involved in any of the eight lawsuits, it is impossible to determine whether that evidence was relevant.[53] Moreover, it cannot be determined whether this evidence would have been sufficient to sustain the verdict.

Because Henry never claimed that it would not be feasible to make the adhesive without the solvents and sodium pentachlorophenate, its product labels used after the date of Guilbeau's alleged exposure were properly excluded from evidence as subsequent remedial measures. FED. R. EVID. 407 (subsequent remedial measures not admissible to show negligence or culpable conduct, but may be admitted to prove feasibility of precautionary measures, if controverted, or for impeachment). The labels were properly

---

Nor can any determinations be made about the nature of this evidence from the questions asked by the Guilbeaus' counsel. It appears that the Guilbeaus offered the 1993 government report because of its statements about pentachlorophenol, which was not in Henry's adhesive. The question regarding the evacuation of a building does not even refer to any Henry products; and the question about other lawsuits refers only to "Henry glue", without specifying any particular product among the many that Henry makes.

excluded for the purpose of impeachment because they stated nothing more than that concentrated, prolonged inhalation causes brain damage, which Henry did not deny; its position was that there had been no concentrated, prolonged inhalation by Guilbeau. Accordingly, even if excluded improperly from evidence, the subsequent product labels are not sufficient to sustain the verdict.[54]

### III.

The dissent "admit[s] that the jury *may* have found for Guilbeau because it mistakenly thought that Henry's glue contained pentachlorophenol."  A review of the record under the proper standard of review, including making all reasonable inferences in favor of the Guilbeaus, leaves no doubt that such mistaken belief is exactly why the jury so found.  The judgment in favor of Olan

---

It is not necessary to reach any of the other issues presented, including Henry's alternative contention that it is entitled to a new trial because of the prejudicial trial tactics and closing arguments of the Guilbeaus' attorneys; the Guilbeaus' contentions on cross-appeal regarding remittitur, prejudgment interest, and intervention; or the Stevens firm's appeal (any recovery subject to recovery by Guilbeaus).

and Macklyn Guilbeau, and the judgment awarding expenses to the intervenors, are **REVERSED**, and judgment is **RENDERED** in favor of Henry.[55]

*REVERSED and RENDERED*


**Emilio M. Garza, Circuit Judge, concurs in the judgment only.**

REYNALDO G. GARZA, Circuit Judge, Dissenting:


I dissent. When the evidence in this case is properly examined under the applicable standard of review, the evidence is sufficient to support the verdict.


I.

The majority opinion sets out the correct standard of review. This Court is to review all of the evidence in the light and with all reasonable inferences most favorable to Guilbeau.[56] The majority fails, however, to properly apply the proper standard of review. The majority draws inferences in favor of Henry, even in

---

As noted repeatedly at oral argument, and in this opinion, and as reflected by the post-argument rejection of attempts by the Guilbeaus' counsel to make improper filings, the conduct by the Guilbeaus' trial counsel and appellate counsel causes more than great concern. Counsel is cautioned that such conduct in the future will result in the imposition of severe sanctions. But, this great concern goes beyond sanctions; the greatest concern is that counsel seems intent on winning at any cost, notwithstanding concomitant violations of long established rules of practice and evidence (all designed to attempt to ensure fundamental fairness), and in disregard, it seems, of the truth. Such tactics will not be tolerated by this court.

*See* Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969)(en banc).

the face of evidence supporting Guilbeau, and at times ignores crucial testimony in Guilbeau's favor. I am therefore forced to dissent and show that the evidence supports the jury's verdict.

In this diversity case, we must apply Louisiana products liability law as set out in *Halphen v. Johns-Manville Sales Corp.*[57] The Louisiana legislature overruled an aspect of *Halphen* when it enacted the Louisiana Products Liability Act.[58] The Act did not take effect, however, until September 1, 1988, and the Louisiana Supreme Court has held that it does not apply retroactively.[59] Because Guilbeau was exposed to Henry's product before September 1, 1988, we look to the case law that developed before the Act came into effect.[60]

Under *Halphen*, Guilbeau must show (1) he was injured; (2) his injury was caused by a condition in Henry's glue; (3) the condition made the glue unreasonably dangerous for normal use; and (4) the condition existed at the time the glue left Henry's control.[61] There are several categories of unreasonably dangerous products.[62]

---

484 So.2d 110 (La. 1986).

Gilboy v. American Tobacco Co., 582 So.2d 1263, 1264 (La. 1991).

*Id.*

Klem v. E.I. DuPont de Nemours Co., 19 F.3d 997, 1000 (5th Cir. 1994).

*See Klem*, 19 F.3d at 1000; Antley v. Yamaha Motor Corp., 539 So.2d 696, 699-700 (La. App. 3d Cir. 1989)(citing *Halphen*, 484 So.2d at 113).

*Klem*, 19 F.3d at 1000. Under Louisiana law, a product is unreasonably dangerous:
(1) if the danger involved in its use outweighs its utility, it is said to be per se unreasonably dangerous;
(2) in construction or composition, if it contains an

One of these categories is products that are unreasonably dangerous because of a failure to warn.  Henry is required to provide an adequate warning of any danger inherent in the normal use of the glue that is not within the knowledge of or obvious to the ordinary user.[63]  If Henry fails to adequately warn about a danger related to the way the glue is designed, the glue is unreasonably dangerous.[64]

## II.

When the evidence is reviewed in the light most favorable to Guilbeau, it is sufficient to satisfy all the elements of a products liability cause of action.  First, Guilbeau was injured. He was sickened after being exposed to Henry's glue.  Second, his injury was caused by a condition in Henry's glue; namely, the presence of organic solvents.  Third, Henry's failure to warn about the presence of organic solvents made the glue unreasonably dangerous.  Finally, the organic solvents were present when the glue left Henry's control.

## A.

---

unintended abnormality or condition that renders it more dangerous than it is designed to be; (3) for lack of warning, if the manufacturer failed to adequately warn of the dangers that attend its use; or (4) by design, if safer alternative products were available or the product could have been designed in a less dangerous manner.
*Id.* at 1000-1001.

*See Halphen*, 484 So.2d at 115.

*See id.*

The evidence is sufficient to support a finding that Guilbeau was injured after being exposed to Henry's glue. Before Guilbeau was exposed to Henry's glue, he was a relatively healthy and well-adjusted man. His wife testified that he was not a sickly man, but was "healthy . . . a robust man. . . . and there was not a thing wrong with him." His co-workers also testified that he was "never sick," was "healthy," and that he "never complained . . . at leas[t] until they start[ed] putting down the glue."[65] Granted, his health was not perfect. He smoked, had a few previous upper respiratory infections, and had bouts with high blood pressure. But his health was dramatically better before he was exposed to Henry's glue than after his exposure.

He was also psychologically well-adjusted. His wife and co-workers testified that, before he was exposed to Henry's glue, he was a happy man, a wonderful husband and an extremely successful salesman. Although he did attempt suicide after his wife refused his initial marriage proposal in 1969, seventeen years before he was exposed to Henry's glue—his wife testified that he did not do "any other thing like that" after 1969.

The majority tries to cast aspersions on Guilbeau's sanity by pointing out that his honorable discharge from the Army, which

---

Guilbeau's attorney asked Rollin Duplechin, one of Guilbeau's co-workers, "But before the time that ya'll put the glue down, had you ever seen Mr. Guilbeau appearing to be sick in any way?" Duplechin replied, "No, never was sick. Never complained to us, at leas[t] until they start[ed] putting down the glue." Similarly, Jonathan Shaw, who also worked with Guilbeau, testified that Guilbeau did not complain about odors or smells before the exposure, and that he was "healthy and fun to be around" before he was exposed the Henry's glue.

stated that he was discharged for having a knee problem, was signed by a psychiatrist. However, his wife testified that he hurt his knee before he enlisted in the Army, and then dislocated that same knee while in the service when he slid down an embankment. When viewed in the light most favorable to the Guilbeau, this evidence indicates that he was discharged because he had a knee problem. Despite the requirement that all inferences be drawn in Guilbeau's favor, however, the majority infers from the fact that a psychiatrist signed the discharge that Guilbeau was actually discharged for other reasons. Such an inference is simply not allowable under the proper standard of review.

The majority attempts to further question Guilbeau's mental stability by pointing out that Dr. Clause prescribed tranquilizers to Guilbeau for anxiety in the early-to-mid 1970's. Dr. Clause testified, however, that the last time he prescribed anxiety medication to Guilbeau was May 27, 1977, nine years before his exposure to Henry's glue. Dr. Clause also testified that Guilbeau was not chronically nervous or anxious, and that during 28 years of treatment he saw no sign that Guilbeau was suffering from a psychiatric disorder. Dr. Clause's opinion was collaborated by Guilbeau's wife and co-workers' testimony that, before the exposure, Guilbeau did not suffer from the "temper tantrums" and other psychological problems that he suffered after he was exposed to Henry's glue. Finally, Dr. Clause testified that Guilbeau never complained to him about a problem he did not have.

After Guilbeau was exposed to Henry's glue on August 15, 16

and 18, 1986, both his physical and mental health drastically deteriorated. He began to suffer from equilibrium problems, impaired judgment, inability to control his emotions, panic attacks, cacosmia,[66] and seizures. All of the witnesses—including Dr. Clause, who was called by the defense—who observed Guilbeau both before and after he was exposed to Henry's glue agree that he was dramatically sickened immediately after the exposure.

In short, the evidence is sufficient to show that Guilbeau exhibited many symptoms after being exposed to Henry's glue that he did not exhibit before exposure. Although Guilbeau may not have been in perfect health before he was exposed to Henry's glue, the evidence definitely supports a finding that he was better before exposure than afterwards.


B.

Having found that the evidence is sufficient to show that Guilbeau became sick after being exposed to Henry's glue, We now turn to the next question: Whether the evidence supports a finding that Guilbeau's sickness was caused by a condition in Henry's glue. Our review of the record shows that the evidence is sufficient to support such a finding. Specifically, there is sufficient evidence to show that Guilbeau was injured because he was exposed to organic solvents that were present in Henry's glue.

First, causation is supported by common sense inferences from

---

A condition in which innocuous smells cause severe nausea. Dr. Harper testified that cacosmia is an indication of exposure to organic solvents.

the lay testimony. Guilbeau's wife and co-workers testified that he became sickened after being exposed to the glue. That testimony supports a common sense inference that the glue caused his sickness.

Second, Dr. Harper testified that Guilbeau's sickness was most likely caused by exposure to organic solvents contained in Henry's glue. Dr. Harper was a board certified neurologist, who was also trained in pharmacology and psychopharmacology, and who had broad experience with the toxic effects of various substances. Dr. Harper testified that Guilbeau suffered from toxic encephalopathy, a form of brain damage, and that exposure to Henry's glue was the most likely cause of Guilbeau's brain damage. Dr. Harper's opinion was based on several facts. First, he based it on the fact that Guilbeau's health and behavior changed drastically after he was exposed to Henry's glue. Second, he based it on Guilbeau's cacosmia. Dr. Harper testified that cacosmia is caused by exposure to chemicals, and that he had never seen a patient who suffered from cacosmia that was not exposed to chemicals. He also based his opinion on a SPECT scan, which showed decreased blood flow in portions of Guilbeau's brain in a pattern that was consistent with toxic encephalopathy. Finally, he based his opinion on the fact that Henry's glue contained several organic solvents, including ethylbenzene, methylene chloride, xylene, methyl ethyl ketone and toluene, all of which cause toxic encephalopathy. Notably, Dr. Harper did not base his opinion upon the presence of pentachlorophenol. In fact, he never mentioned the word

pentachlorophenol during his testimony. Dr. Harper also testified that Guilbeau's injury was not caused by smoking, sawdust or formaldehyde, and that it was not a spontaneous psychological experience.

In summary, Dr. Harper based his opinion on the fact that Henry's glue contained chemicals that cause brain damage, that Guilbeau was exposed to the glue, and that shortly thereafter he went from being relatively healthy to suffering from toxic encephalopathy. This basis is sufficient to support his testimony that the organic solvents in Henry's glue caused Guilbeau's sickness.

Guilbeau also presented the testimony of Dr. Reddy, a Ph.D. chemist. Dr. Reddy's testimony establishes that Henry's glue contains the organic solvents that Dr. Harper said caused Guilbeau's sickness. Henry refused to disclose the glue's ingredients until midway through trial, so Guilbeau was forced to have Dr. Reddy analyze two samples of Henry's glue to determine which organic solvents were present. In one sample, Dr. Reddy found significant amounts of ethylbenzene, methylene chloride, xylene and methyl ethyl ketone. In the other sample, Dr. Reddy found those four solvents, as well as toluene and trichloroethane.[67]

---

Dr. Reddy explained that the reason that the second sample contained organic solvents that the first sample did not was that the plastic can from which the first sample had been taken had been opened. Volatile organic solvents like toluene and trichloroethane easily evaporate from an open can. Thus, the jury could have reasonably inferred that the glue to which Henry was exposed contained toluene and trichloroethane, but that those solvents had evaporated out of the plastic can from which the first sample had been taken before Guilbeau had it tested.

These are the same organic solvents that Dr. Harper testified were the most likely cause of Guilbeau's toxic encephalopathy.

Dr. Callender also testified that Guilbeau was sickened by exposure to Henry's glue. Dr. Callender is board certified in internal medicine, and specializes in neurotoxicology—the study of how chemicals affect the nervous system, including the brain. He testified that Guilbeau suffered from toxic encephalopathy, which was caused by exposure to compounds contained in Henry's glue. He based his opinions on several factors. First, Guilbeau exhibited numerous symptoms after being exposed to Henry's glue that he did not exhibit before exposure. Second, chemicals that cause toxic encephalopathy, including organic solvents, were present in Henry's glue. Third, the symptoms Guilbeau suffered were consistent with "acute organic solvent exposure syndrome," a cluster of symptoms associated with exposure to organic solvents. Fourth, the SPECT scan showed areas of decreased brain function, which was consistent with toxic encephalopathy. Finally, Dr. Callender eliminated all possible confounders; that is, he determined that Guilbeau's symptoms were not caused by other factors.

Dr. Callender's opinions are limited, however, by his mistaken belief that Henry's glue contained pentachlorophenol. Dr. Callender's mistaken belief arose from his misreading of the Material Safety Data Sheet (MSDS) for Henry's glue. The MSDS indicated that Henry's glue contained sodium pentachlorophenate. Dr. Callender mistakenly believed that sodium pentachlorophenate was a form of pentachlorophenol. Dr. Callender went on to describe

in great detail the dangerous nature of pentachlorophenol, and how pentachlorophenol, in concert with the organic solvents, caused Guilbeau's injuries.

Henry's counsel did nothing to clear up Dr. Callender's confusion. He did not object to Dr. Callender's testimony regarding pentachlorophenol on the ground that there was no evidence that Henry's glue contained pentachlorophenol, nor did he point out the difference between pentachlorophenol and sodium pentachlorophenate during cross-examination. Further, both Henry's counsel and Henry's expert witnesses referred to the sodium pentachlorophenate in the glue as pentachlorophenol on numerous occasions. In fact, Henry's counsel did not bring out the fact that the glue did not contain pentachlorophenol until the last day of trial, when Dr. Berger, one of Henry's experts, pointed out the difference between the two compounds and testified that the glue did not contain pentachlorophenol.

Despite the fact that Henry did not object to Guilbeau's experts' testimony regarding pentachlorophenol, the fact remains that there is no evidence that the glue contained pentachlorophenol. Therefore, any testimony based upon the presence of pentachlorophenol cannot support the verdict. The fact that Henry's glue did not contain pentachlorophenol does not end our inquiry, however. This Court must still examine the record to see if there is sufficient testimony that is not based on the presence of pentachlorophenol to support the verdict.

When the record is reviewed in the light most favorable to

Guilbeau, it does contain sufficient evidence for a reasonable person to find that organic solvents in the glue caused Guilbeau's sickness. A reasonable juror would have believed Dr. Berger's statement that the glue did not contain pentachlorophenol, especially since Henry's counsel emphasized during his closing argument that the glue did not contain pentachlorophenol. There was evidence that the glue contained organic solvents, however. Based on the testimony of Dr. Callender and Dr. Harper, a reasonable juror could find that Guilbeau's injuries were caused by those organic solvents.

Of course, Henry presented evidence that Guilbeau's injuries were not caused by the glue. Dr. Friedberg testified that Guilbeau suffered from a somatization disorder, although he could not rule out the possibility that Guilbeau's problems were caused by exposure to organic solvents. Dr. Rees and Dr. Black also opined that Guilbeau was a somatisizer. Further, they testified that Guilbeau did not suffer from brain damage, and that his problems were not caused by exposure to organic solvents. Finally, Henry presented the testimony of Dr. Berger, who testified that Guilbeau suffered from lung disease and personality problems, but was not injured by exposure to Henry's glue. Henry's experts' testimony was inconsistent with Guilbeau's experts' testimony. Guilbeau's experts testified that his problems were caused by exposure to organic solvents, while Henry's experts testified that his problems were psychological. The resolution of this conflict, however, was strictly within the province of the jury. The jury apparently

found Guilbeau's experts more credible, and believed them instead of Henry's experts.  This Court does not have the power to overturn such a credibility determination.  Thus, the testimony of Guilbeau's experts, bolstered by common sense inferences from lay testimony, is sufficient evidence upon which a reasonable juror could find that Guilbeau was sickened as a result of being exposed to Henry's glue.

C.

The evidence was sufficient to establish that Henry's glue was unreasonably dangerous because Henry failed to warn about the danger posed by organic solvents.  It is undisputed that Henry did not include a warning about the danger of organic solvents on the glue's label.  Dr. Callender testified that the glue should have contained a warning.  His opinion was not contingent on the presence of pentachlorophenol in the glue.  In fact, he testified that, even if the glue did not contain pentachlorophenol, it was still unreasonably dangerous because it did not warn about the dangerous organic solvents.  Specifically, Dr. Callender testified as follows:

> [Mr. Musselwhite]  Now, if for any reason the defendants were to contend . . . that pentachlorophenol was not in the product[,] . . . would the warning be pretty much the same except you'd just eliminate the reference to pentachlorophenol:
>
> [Dr. Callender]  Yes.
>
> [Mr. Musselwhite]  So you would still warn as to these other chemicals that showed up on the tests run by Dr. Reddy and Dr. Subra, still warn as to those chemicals in the same way you've warned here?

[Dr. Callender]  Right.

[Mr. Musselwhite]  Is that correct?  And the failure to do so would render the label inadequate; is that your opinion?

[Dr. Callender]  Right.

The evidence supports Dr. Callender's testimony.  Dr. Reddy found that Henry's glue contained significant amounts of organic solvents.  Dr. Callender's testimony established that the dangers of organic solvents were well established in the scientific literature when Henry manufactured the glue.  Thus, there is a sufficient foundation for Dr. Callender's opinion testimony that the glue should have warned about the dangers of organic solvents.  Dr. Callender's opinion testimony, in turn, was sufficient evidence for a reasonable juror to find that Henry's glue was unreasonably dangerous because of Henry's failure to warn.

The majority contends that, assuming Guilbeau was sickened by Henry's glue, the product was not unreasonably dangerous because, out of the millions of applications of Henry's glue, Guilbeau was the only person to have an adverse reaction.  In making this contention, the majority cites *Lemoine v. Aero-Mist, Inc.*,[68] a Louisiana case that held that a product is not unreasonably dangerous because a person has an idiosyncratic reaction to it.  *Lemoine*, as well as the line of cases upon which its holding is based,[69] is easily distinguishable from Guilbeau's case.  In

539 So.2d 712 (La. App. 3d Cir. 1989).

*See, e.g.*, Booker v. Revlon Realistic Professional Products, Inc., 433 So.2d 407, 410 (La. App. 4th Cir. 1983); Rhodes v. Max Factor, Inc., 264 So.2d 263, 266 (La. App. 4th Cir. 1972).

*Lemoine*, a woman suffered an allergic reaction after she was exposed to an insecticide manufactured by Aero-Mist, Inc.[70] The trial court found that her allergic reaction was very rare, and held that a manufacturer has no duty to warn against the possibility of a rare or idiosyncratic sensitivity.[71] The other cases cited by the majority are to the same effect.[72]

The evidence in this case, however, supports a finding that Guilbeau did not have an idiosyncratic reaction. Guilbeau presented evidence that the glue contained organic solvents, which are known to be dangerous. He also presented evidence that he was injured because he was exposed to dangerous organic solvents, not because he had an idiosyncratic allergic reaction. His experts testified that organic solvents are simply dangerous, not that they cause an allergic reaction in a few people.

The majority simply misconstrues Louisiana law. A plaintiff does not have to prove that other people have been injured by a product in order to show that the product was unreasonably dangerous. He simply has to show that the product—either because of inherent dangerousness or because or an inadequate warning—is

---

*Lemoine*, 539 So.2d at 713.

*Id.* at 713-14.

*See, e.g.*, *Booker*, 433 So.2d at 410 (holding that plaintiff could not recover when the trial court found that she either misapplied the product or suffered an idiosyncratic allergic reaction to it); *Rhodes*, 264 So.2d at 266 (Holding that plaintiff could not recover for injury caused by her idiosyncratic allergic reaction to a product).

unreasonably dangerous to a reasonably foreseeable user.[73]  Because Guilbeau showed that the presence of organic solvents made the glue unreasonably dangerous for normal use because of Henry's failure to provide an adequate warning, rather than showing that he had a rare allergic reaction to the glue, the evidence is sufficient to uphold the verdict.

D.

The evidence was sufficient to show that the glue contained organic solvents when it left Henry's control.  Dr. Reddy testified that a three-and-a-half gallon plastic can of Henry's glue contained four organic solvents:  ethylbenzene, methylene chloride, xylene and methyl ethyl ketone.  Dr. Reddy also tested a metal can of Henry's glue, which was purchased after Guilbeau's exposure, and found those four solvents, as well as toluene and trichloroethane. Dr. Reddy explained that the reason that the metal can contained organic solvents that the plastic can did not was that the plastic can had been opened.  Volatile organic solvents like toluene and trichloroethane easily evaporate from an open can.  Thus, the jury could have reasonably inferred that the glue to which Henry was exposed contained toluene and trichloroethane, but that those solvents had evaporated out of the plastic can before Guilbeau had it tested.  Dr. Reddy's analysis of Henry's glue, especially that of the unopened can bought off the shelf, is sufficient evidence to

_____

Extremely rare or idiosyncratic allergic reactions are not reasonably foreseeable.  Thus, there is no duty to warn about them.

support the jury's finding that the glue contained organic solvents when it left Henry's control.

III.

Because, as we have shown, the record contains sufficient evidence to uphold the verdict, I dissent.  Although I admit that the jury *may* have found for Guilbeau because it mistakenly thought that Henry's glue contained pentachlorophenol, there is sufficient evidence to support the inference—which, like all inferences supporting the verdict, must be made—that the jury based its verdict on the presence of organic solvents rather than on the mistaken belief that the glue contained pentachlorophenol.

Further, Henry neither objected to Guilbeau's evidence regarding pentachlorophenol nor cross-examined Guilbeau's experts on the ground that the glue did not contain pentachlorophenol.  In fact, Henry did not even point out that the glue did not contain pentachlorophenol until the last day of trial.  The first time that Henry objected to Guilbeau's experts use of the terms "pentachlorophenol" or "PCP" was in its motion for a new trial.  Because Henry failed to even object to Guilbeau's presentation of evidence regarding pentachlorophenol during trial, I do not think that the prejudice that Henry suffered because the jury was told about pentachlorophenol is the kind of plain error that would mandate a new trial.[74]  Further, even if we found that the jury was

_____

*See* McCann v. Texas City Refining, Inc., 984 F.2d 667, 673 (5th Cir. 1993)(holding that issues raised for the first time on appeal are reviewed only for plain error).

affected by evidence of pentachlorophenol that should not have been before it, the worst that this Court should do would be to remand this case for a new trial, not to reverse and render.

For the reasons stated above, I would **AFFIRM** the district court.